**ON REHEARING EN BANC**

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1591**

HERNAN PORTILLO FLORES,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

------------------------------

AMERICAN IMMIGRATION LAWYERS ASSOCIATION, Washington DC Chapter; AMERICAN IMMIGRATION LAWYERS ASSOCIATION, National; AMERICAN IMMIGRATION LAWYERS ASSOCIATION, Carolinas Chapter; FORMER IMMIGRATION JUDGES AND BOARD OF IMMIGRATION APPEALS MEMBERS; FAIRFAX COURT APPOINTED SPECIAL ADVOCATES; KIDS IN NEED OF DEFENSE (KIND); LEGAL AID JUSTICE CENTER and IMMIGRANT HEALTH EXPERTS,

Amici Supporting Rehearing Petition.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: March 8, 2021                    Decided: June 29, 2021

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, HARRIS, RICHARDSON, QUATTLEBAUM, and RUSHING, Circuit Judges.

Petition for review granted, vacated and remanded by published opinion. Judge Thacker wrote the opinion, in which Chief Judge Gregory and Judges Motz, King, Keenan, Wynn, Diaz, Floyd, and Harris joined. Judge Wynn wrote a separate concurring opinion. Judge Quattlebaum wrote a dissenting opinion, in which Judges Wilkinson, Niemeyer, Agee, Richardson, and Rushing joined.

**ARGUED:** Paul Whitfield Hughes, III, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Petitioner. Andrew C. MacLachlan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Benjamin J. Osorio, Alexandra Williams, MURRAY OSORIO PLLC, Fairfax, Virginia; Sarah P. Hogarth, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Petitioner. Joseph H. Hunt, Assistant Attorney General, Brian M. Boynton, Acting Assistant Attorney General, Donald E. Keener, Deputy Director, John W. Blakeley, Assistant Director, Holly M. Smith, Senior Litigation Counsel, Sarah K. Pergolizzi, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. D.C. Drake, DRAKE IMMIGRATION LAW, PLLC, Alexandria, Virginia; Anam Rahman CALDERÓN SEGUIN PLC, Fairfax, Virginia; Jillian N. Blake, BLAKE IMMIGRATION LAW, PLLC, Alexandria, Virginia; David L. Cleveland, LAW OFFICE OF DAVID CLEVELAND, Washington, D.C.; Johanna M. Gaughan, GABRIELA J. MATTHEWS & ASSOCIATES, Durham, North Carolina; Tamara L. Jezic, Diana M. Pak Yi, JEZIC & MOYSE, LLC, Wheaton, Maryland; Evelyn R.G. Smallwood, HATCH ROCKERS IMMIGRATION, Durham, North Carolina, for Amici AILA DC and Carolinas Chapters. Charles Shane Ellison, Katherine L. Evans, Amanda G. Dixon, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina; Tyler A. Young, Martin J. Demoret, David Yoshimura, Robert C. Gallup, FAEGRE DRINKER BIDDLE & REATH LLP, Des Moines, Iowa, for Amicus American Immigration Lawyers Association. Steven H. Schulman, AKIN GUMP STRAUSS HAUER & FELD, LLP, Washington, D.C., for Amici Former Immigration Judges and Board of Immigration Appeals Members. Andrew Frackman, New York, New York, John B. Sprangers, Rob Barthelmess, O'MELVENY & MYERS LLP, Los Angeles, California, for Amici Legal Aid Justice Center and Immigrant Health Experts. Lawrence D. Rosenberg, JONES DAY, Washington, D.C., for Amicus Fairfax Court Appointed Special Advocates. Stephen B. Kinnaird, Washington, D.C., Elizabeth Rose Kenerson, Katherine K. Solomon, Mary Wolfe, Zachary Zwillinger, PAUL HASTINGS LLP, New York, New York, for Amicus Kids in Need of Defense.

THACKER, Circuit Judge:

When he was 15 years old, Hernan Portillo-Flores ("Petitioner"), a resident of El Salvador, sought refuge in the United States. When Petitioner was living in El Salvador, El Pelón, a leader of the infamous gang MS-13, and other gang members beat Petitioner on multiple occasions (once almost to the point of death) and made death threats against him because El Pelón wanted to date Petitioner's sister. Despite finding Petitioner and his sister credible, and despite hearing testimony that El Pelón showed up *with the police* to threaten Petitioner's mother at her home, the immigration judge ("IJ") denied Petitioner's claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), and ordered him removed from the United States. The Board of Immigration Appeals ("BIA") affirmed.

In his petition for review, Petitioner contends that the BIA disregarded pertinent, significant evidence; failed to make factual findings sufficient to support its conclusion; failed to provide sufficient explanation for its conclusions; and did not consider the age of Petitioner at the time of his alleged persecution.

Although we owe deference to the BIA, that deference is not blind. Here, where the agency contravened prevailing case law, disregarded crucial evidence, and failed to explain its decisions, we are compelled to grant the petition for review, vacate the immigration court decisions, and remand to the agency for further proceedings.

I.

In 2013, Petitioner was living with his mother and sister, Paola, in Ciudad Delgado, El Salvador. El Pelón, a local MS-13 group leader, began calling and texting Paola, then

3

a tenth grader. El Pelón indicated he wanted Paola to be his girlfriend and told her that if she failed to submit to his demands, he might kill her mother and Petitioner. El Pelón began following Paola and told her that if she continued to refuse him, "something's going to happen" to Petitioner and her mother. A.R. 203.[1] El Pelón would also have other gang members approach her and issue threats. Paola eventually informed her mother of El Pelón's continuing threats. As a result, the family decided to send Paola to the United States for her safety.

After Paola fled El Salvador, El Pelón and other MS-13 members began targeting Petitioner, then only 14 years old, seeking information about Paola's whereabouts. MS-13 approached Petitioner on five or six occasions over the course of several months, always asking him about Paola. Each time they contacted Petitioner, the gang members were armed with knives and guns. Three or four of the times that MS-13 members approached Petitioner, the gang members beat him up. Petitioner's mother saw him arrive home several times without shoes, with bruises, and shirtless. The final beating Petitioner received was so severe that he testified that he "almost die [sic] on that occasion." A.R. 143.[2]

---

[1] Citations to the "A.R." refer to the Administrative Record filed in this appeal.

[2] The dissent faults us for not "describing all the testimony" and "seem[ing] to conclude that, as a matter of medical fact, [Petitioner] was beaten 'almost to the point of death.'" *Post* at 43 n.1 (quoting Maj. Op. at 3). However, Petitioner's testimony -- **credited by the IJ** -- was that he "almost die[d] on th[e] occasion" of the final beating. A.R. 143. In any event, even if Petitioner's injuries did not require medical attention, as explained below, physical harm need not require medical attention to rise to the level of persecution.

4

This last beating prompted Petitioner to disclose the ongoing issue to his mother. Concerned for her child's safety, Petitioner's mother decided to send Petitioner to a ranch in Chalatenango, El Salvador, to live with his uncle. Petitioner testified that he believed MS-13 would have killed him if he had remained in Ciudad Delgado.

Once in Chalatenango, Petitioner remained in hiding. But while Petitioner was in Chalatenango, "four people who were policemen working with the gang members came to [Petitioner's mother's] house threatening [her] so that [Petitioner] would turn himself into [sic] the gang members." A.R. 290. During this encounter, Petitioner's mother saw El Pelón standing outside in the alleyway behind the police. Likewise, Paola testified that when her mother looked out the door during this confrontation with the police, her mother "saw . . . El P[e]lon, so she understood that El P[e]lon or the gang was linked to the police because they were asking about [Petitioner]." *Id.* at 206. Following this incident, Petitioner's mother left her home and remains in hiding in El Salvador.

As a result of the threats and beatings, Petitioner's mother and sister ultimately decided to send Petitioner to the United States. Petitioner entered the United States at age 15 without inspection on approximately October 12, 2015. United States Customs and Border Protection detained Petitioner upon his entry to the United States. Petitioner received a hearing on the charge of removability before an IJ and asserted claims for asylum, withholding of removal, and protection pursuant to the CAT.

At Petitioner's hearing, his sister Paola testified about El Pelón's threats against her brother. Specifically, Paola testified that had Petitioner remained in El Salvador, "if he had not been dead by now, that could have been a miracle from God." A.R. 208. She further

5

testified that she and her mother thought it best to send Petitioner to the United States because "[i]t was going to come to the point that [the gang] w[as] going to be able to find him. And they weren't going to be using words anymore. He was going to get murdered." *Id.*

For his part, Petitioner testified that had he stayed in Ciudad Delgado, the MS-13 members "would have killed me because the last time they beat me up, . . . I almost died. And I believe that they could have taken more reprisals against me." A.R. 146–47. Petitioner also testified that he did not go to the police "because [he] knew that the police did not have the capacity to protect [him] from th[e] gang." *Id.* at 147. He recounted that a friend, Omar, who filed a police report against the gang, "turned up dead" "inside of a well." *Id.* at 148.

Significantly, the IJ found both Petitioner and his sister Paola credible "due to their demeanor, their candor, they were responsive to all questions, and their testimony was consistent, both between their two testimonies and also with the written statements that are in the file." A.R. 79. Petitioner also filed numerous exhibits including declarations from family members and neighbors corroborating his stated reasons for leaving El Salvador. His mother submitted a declaration explaining, "Several times the MS-13 gang members beat [Petitioner] up," always "ask[ing] him for his sister Paola." *Id.* at 290. The gang members "told [Petitioner] that if he did not turn Paola in to them, then they were going to do damage to him and to his family." *Id.* Petitioner's mother also "received threats from the gang members" and "lost [her] house" because she had to leave. *Id.* The family was "living in fear." *Id.*

6

Petitioner supplemented the testimonial evidence about the danger he faced in El Salvador and the inability of the police to protect him with expert analysis explaining how MS-13 can "operate . . . largely without police or military interference because of corruption and the Salvadoran government's inability to maintain order," and how filing a police report can make matters worse because gang members will "seek to obtain the name of the person who reported [their activity] via their sources within the police, government and community and take revenge to send the message that others should not report similar crimes." A.R. 387. Indeed, the most that targets of gangs could expect "is for the police to guard their door while they packed their things to flee their homes." *Id.* at 369. Additionally, Petitioner provided United States Department of State country conditions reports from the relevant years detailing "widespread corruption," as well as "weak rule of law, which contributed to high levels of impunity and government abuse, including unlawful killings by security forces." *Id.* at 440. These reports explain that, "[i]mpunity persisted despite government steps to dismiss and prosecute" bad actors within security forces, the justice system, and the executive branch. *Id.*

Ultimately, the IJ issued an oral decision denying Petitioner all requested relief and ordering his removal. The IJ acknowledged that MS-13 threatened to kill Petitioner but concluded that Petitioner failed to demonstrate a nexus between the threats and beatings and a protected ground sufficient to support his claim for asylum. The IJ then determined "the harm that [Petitioner] suffered did not occur at the hands of the El Salvadoran government or an agent that the government is unwilling or unable to control" because Petitioner "did not report any of the threats or the beatings that he received to the police."

7

A.R. 80–81. The IJ noted "[t]here is no doubt El Salvador has a high rate of crime," but its government "has put measures into place to address criminal activity and has arrested gang members and corrupt police officers." *Id*. at 81.

Petitioner timely filed a notice of appeal to the BIA, which dismissed Petitioner's appeal in a single member decision, concluding that the IJ did not commit error as to any of Petitioner's three claims for relief. The BIA concluded that the IJ "correctly found that although [Petitioner] was threatened and beaten on several occasions in El Salvador, he never suffered any serious physical harm requiring medical attention," and any death threats were made to Paola, not Petitioner. A.R. 9–10. The BIA also held that the IJ did not clearly err in concluding that Petitioner failed to demonstrate that the harm he fears in El Salvador "was or would be inflicted by the government or by individuals or groups that the government is unable or unwilling to control." *Id.* at 11. Like the IJ, the BIA emphasized Petitioner's failure to report any threats or mistreatment to the police or government officials in El Salvador.

## II.

We possess jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252(a). "When, as here, the BIA adopts and affirms the IJ's decision and supplements it with its own opinion, we review both decisions." *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014); *see also* Resp't's Suppl. Resp. Br. 15 (Government submitting that the BIA "adopt[ed] and supplement[ed] the [IJ]'s reasoning").

8

We review the BIA's legal conclusions de novo. *See Cordova*, 759 F.3d at 337. We generally give *Chevron*[3] deference to interpretations of statutes the BIA administers, namely the Immigration and Nationality Act ("INA"), if the BIA's interpretation carries the force of law. *See Martinez v. Holder*, 740 F.3d 902, 909 (4th Cir. 2014). But significantly, when the BIA issues a single-member, nonprecedential opinion, as it did here, that opinion does not carry the force of law and is not entitled to *Chevron* deference. *See id.* at 909–10. We may still rely on the BIA's interpretation of the INA as a "body of experience and informed judgment to which we may properly resort for guidance"; however, "even that modest deference depends upon the thoroughness evident in the BIA's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* at 910 (alteration, citations, and internal quotation marks omitted).

Further, we do not disturb the BIA's factual determinations on asylum eligibility as long as those determinations "are supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). "We review factual findings for substantial evidence, treating them as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Cordova*, 759 F.3d at 337 (internal quotations omitted); *see also Mulyani v.*

---

[3] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (providing that where an agency interprets a statute it administers, we must defer to the agency's permissible construction of the statute if it is silent or ambiguous).

*Holder*, 771 F.3d 190, 197 (4th Cir. 2014) (withholding of removal); *Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011) (CAT relief).

Finally, we will uphold the BIA's decision "unless it is manifestly contrary to law and an abuse of discretion." *Cordova*, 759 F.3d at 337 (internal quotations omitted). The BIA abuses its discretion "if it fails to offer a reasoned explanation for its decision, or if it distorts or disregards important aspects of the applicant's claim." *Id.* (alterations and internal quotations omitted). "[A]n applicant for asylum is entitled to know that agency adjudicators reviewed all [his] evidence, understood it, and had a cogent, articulable basis for its determination that [his] evidence was insufficient." *Orellana v. Barr*, 925 F.3d 145, 153 (4th Cir. 2019) (internal quotation marks omitted). "As a general matter, when the B[IA] errs, 'the proper course . . . is to remand to the agency for additional investigation or explanation.'" *Alvarez Lagos v. Barr*, 927 F.3d 236, 249 (4th Cir. 2019) (quoting *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam)).

### III.

Petitioner sought and was denied three forms of relief from removal in the immigration courts: asylum, withholding of removal, and relief under the CAT.

### A.

<u>Asylum</u>

The INA authorizes the Attorney General to grant asylum to a refugee. 8 U.S.C. § 1158 (b)(1)(A). The burden of proving eligibility for asylum rests with the applicant. *See id.* § 1158(b)(1)(B); 8 C.F.R. § 208.13(a). In order to bring a successful asylum claim, an applicant "must produce evidence establishing three elements":

10

> (1) that the applicant has suffered past persecution or has a well-founded fear of future persecution; (2) that the persecution is "on account of" h[is] race, religion, nationality, membership in a particular social group, or political opinion; and (3) that the persecution is perpetrated by an organization that h[is] home country's government is unable or unwilling to control.

*Arita-Deras v. Wilkinson*, 990 F.3d 350, 357 (4th Cir. 2021) (citing *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 246 (4th Cir. 2017)); *see also* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)–(B)(i) (defining "refugee" as a person outside the country of his nationality who is "unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear or persecution on account of . . . membership in a particular social group"). As explained below, the BIA erred at every step of the asylum analysis.

1.

Element #1: Persecution

First, an applicant must show that he has "suffered past persecution or has a well-founded fear of future persecution." *Arita-Deras*, 990 F.3d at 357. "Persecution involves the infliction or *threat* of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds in the refugee definition." *Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005) (internal quotation marks omitted) (emphasis supplied). "Although the term 'persecution' includes actions less severe than threats to life or freedom, actions must rise above the level of mere harassment to constitute persecution." *Id.* (internal quotation marks omitted). "We repeatedly have held that death threats qualify as persecution, and we recently rejected any requirement that an applicant suffer physical harm in order to

11

prove persecution resulting from such death threats." *Arita-Deras*, 990 F.3d at 359 (citations omitted).

a.

Past Persecution

The IJ concluded that Petitioner has not established past persecution. The IJ credited the testimony that Petitioner was "severely beaten," A.R. 77; "sustained injuries," *id.*; and was "beaten and threatened on several occasions," *id.* at 79, culminating in a beating so severe that Petitioner testified that he "almost die[d]," *id.* at 143. The IJ nonetheless concluded those injuries "did not require any medical attention and *based on that*, the Court finds that the level of harm [Petitioner] experienced does not rise to the level of persecution." *Id.* at 79 (emphasis supplied). The BIA adopted the IJ's conclusion, explaining that Petitioner did not experience past persecution because he "never suffered any serious physical harm requiring medical attention." *Id.* at 2.

i.

Both the IJ and the BIA legally erred in relying *solely* on the notion that Petitioner's injuries did not require medical attention as grounds to reject Petitioner's persecution argument. As set forth in our recent decision in *Arita-Deras*, this court has rejected "any requirement that an applicant suffer physical harm in order to prove persecution resulting from . . . death threats." 990 F.3d at 359. To the contrary, "[w]hile persecution is often manifested in physical violence, the harm or suffering amounting to persecution need not be physical, but may take other forms, so long as the harm is of sufficient severity." *Mirisawo v. Holder*, 599 F.3d 391, 396 (4th Cir. 2010) (alterations and internal quotation

12

marks omitted); *see also Oliva v. Lynch*, 807 F.3d 53, 59 (4th Cir. 2015). Like the Third Circuit, we do not "condition a finding of past persecution on whether the victim required medical attention or even on whether the victim was physically harmed at all." *Blanco v. Att'y Gen. United States*, 967 F.3d 304, 311 (3d Cir. 2020) (alterations and internal quotation marks omitted). Nor do we "reduce[] our persecution analysis to a checklist" or "measure the severity of an injury in stitches." *Id.* (alterations and internal quotation marks omitted).

It is crystal clear[4] from the IJ's decision, which the BIA adopted, that the agency rejected Petitioner's persecution argument solely because the injuries did not require medical attention. This was legal error, and as such, an abuse of discretion. *See Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014). We must vacate and remand for an appropriate analysis. *See Alvarez Lagos v. Barr*, 927 F.3d 236, 249 (4th Cir. 2019).

ii.

Upon remand, the BIA should bear in mind that the harm need not be physical. "[W]e have expressly held that 'the threat of death qualifies as persecution.'" *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015) (quoting *Crespin-Valladares v. Holder*, 632 F.3d 117, 126 (4th Cir. 2011)). And where physical harm has occurred, as here, the

---

[4] The dissent's attempt to cast the IJ's conclusion on this point as anything but "crystal clear" falls flat. *Post* at 46 n.5. The dissent posits that maybe the IJ *meant* the lack of medical attention is merely some *evidence* that Petitioner's beating did not rise to the level of persecution. But that is simply not what the agency said. Rather, the IJ could not be more clear that "*based on*" the fact that Petitioner's injuries "did not require any medical attention," "the level of harm [Petitioner] experienced does not rise to the level of persecution." A.R. 79 (emphasis supplied).

13

main question is whether Petitioner's mistreatment was of "sufficient severity," *Oliva*, 807 F.3d at 59 (internal quotation marks omitted), keeping in mind that "[a] key difference between persecution and less-severe mistreatment is that the former is 'systematic' while the latter consists of isolated incidents," *Baharon v. Holder*, 588 F.3d 228, 232 (4th Cir. 2009) (quoting *Bocova v. Gonzales*, 412 F.3d 257, 263 (1st Cir. 2005)).

The agency should also recognize that death threats need not be made directly to the petitioner. Indeed, we have rejected the Government's insinuation that death threats made against a petitioner "did not amount to persecution because some of them were made to family members rather than to her directly." *Diaz de Gomez v. Wilkinson*, 987 F.3d 359, 363 n.2 (4th Cir. 2021). Rather, we have found a petitioner was subject to past persecution where "the gang told [the petitioner's] husband and parents that [she] would be killed if her family members did not agree to the gang's demands," and these threats were "not 'unspecific' or 'distant verbal threats and intimidation.'" *Id*. (quoting *Cortez-Mendez v. Whitaker*, 912 F.3d 205, 209 n.* (4th Cir. 2019)).

### iii.

Finally, "age can be a critical factor in the adjudication of asylum claims and may bear heavily on the question of whether an applicant was persecuted or whether []he holds a well-founded fear of persecution." *Liu v. Ashcroft*, 380 F.3d 307, 314 (7th Cir. 2004); *see also Abay v. Ashcroft*, 368 F.3d 634, 640 (6th Cir. 2004) (overturning the immigration judge's finding that a nine-year-old applicant had not adequately expressed a fear of future persecution, explaining "children's testimony should be given liberal benefit of the doubt" in analyzing persecution (internal quotation marks omitted)). This is especially true where,

14

as here, members of Petitioner's family were threatened as well, because "[v]iolence or threats to one's close relatives is an important factor in deciding whether mistreatment sinks to the level of persecution." *Baharon*, 588 F.3d at 232.

In this regard, several of our sister circuits have noted the particular relevance of age in this context, stating "a principle that is surely a matter of common sense: a child's reaction to injuries to his family is different from an adult's. The child is part of the family, the wound to the family is personal, the trauma apt to be lasting." *Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042, 1045 (9th Cir. 2007). The Ninth Circuit, along with the Second, Sixth, and Seventh Circuits recognize the legal rule that "injuries to a family must be considered in an asylum case where the events that form the basis of the past persecution claim were perceived when the petitioner was a child." *Id.* at 1046; *see also Jorge-Tzoc v. Gonzales*, 435 F.3d 146, 150 (2d Cir. 2006) (per curiam) (explaining that, though the petitioner was never victimized directly, the combination of circumstances that might not constitute persecution for an adult "could well constitute persecution to a small child totally dependent on his family and community"); *Liu*, 380 F.3d at 314; *Abay*, 368 F.3d at 640.

Today, we too recognize this common sense rule and instruct the BIA to apply it on remand: Where a petitioner is a child at the time of the alleged persecution, the immigration court must take the child's age into account in analyzing past persecution and fear of future persecution for purposes of asylum. Therefore, even if Petitioner's beatings and the threats made against him would not rise to the level of past persecution for an adult, they may satisfy past persecution for a child. The Department of Justice has itself acknowledged "[t]he harm a child fears or has suffered . . . may be relatively less than that of an adult and

15

still qualify as persecution." U.S. Dep't of Justice, Immigr. & Naturalization Serv., File No. 120/11.26, *Guidelines for Children's Asylum Claims*, 1998 WL 34032561, at *14 (Dec. 10, 1998).

We find this rule, with which the dissent agrees, to be especially vital against the backdrop of studies documenting mental health issues in child asylum-seekers. A 2019 study by the Physicians for Human Rights found that 76% of child asylum-seekers from El Salvador and neighboring countries had at least one major mental health issue, including post-traumatic stress disorder (64%), major depressive disorder (40%), and anxiety disorder (19%). *See* Legal Aid Justice Center & Immigrant Health Experts, Amicus Br. at 4 (citing Kevin Ackerman, et al., *There Is No One Here to Protect You*, Physicians for Human Rights, at 2 (2019), https://phr.org/wp-content/uploads/2019/06/PHR-Child-Trauma-Report-June-2019.pdf (filed as ECF attachment)). Furthermore, "'children are more likely to be distressed by hostile situations, or to believe improbable threats' and are 'more sensitive to acts that target close relatives.'" Kids in Need of Defense, Amicus Br. at 14 (quoting United Nations High Commissioner for Refugees Guidelines ¶¶ 16-17) (alterations omitted)).

iv.

For these reasons, the IJ and BIA analysis on past persecution was not just incomplete, it was legally erroneous and, as such, an abuse of discretion.

16

b.

Well-Founded Fear of Future Persecution

An asylum applicant can also demonstrate a well-founded fear of persecution to satisfy the first element of an asylum claim. If the applicant can establish that he suffered past persecution, he is "presumed to have a well-founded fear of future persecution." *Naizgi v. Gonzales*, 455 F.3d 484, 486 (4th Cir. 2006). The Government may rebut that presumption by demonstrating: (1) a fundamental change in circumstances; or (2) that Petitioner could safely relocate within El Salvador. *See Ortez-Cruz v. Barr*, 951 F.3d 190, 198 (4th Cir. 2020).

> On Petitioner's fear of future persecution claim, the IJ explained:

> > Although [Petitioner] has shown that he may suffer harm if he returns to El Salvador even though the Court does not agree that that harm rises to the level of persecution, he has not shown a nexus to a protected ground or that the harm will occur at the hands of the El Salvadoran government or an agent that the government is unwilling or unable to control.

A.R. 81. This explanation is nonsensical, as it conflates the second and third prongs of the asylum analysis -- nexus and government conduct -- with the first prong, which is concerned with past or future persecution.

The BIA, for its part, made the same error, conflating the persecution analysis with the nexus analysis. *See* A.R. 3 ("[Petitioner] has not established a well-founded fear of persecution because he did not meet his burden of establishing the requisite nexus . . . ."). The BIA also concluded that even if Petitioner had established past persecution, he could not establish a well-founded fear of future persecution because he is now 18 years old,

which is a "fundamental change in circumstances." A.R. 3. But if the BIA wanted to rely on this fact to rebut a presumption of future persecution, it needed to explain why "a reasonable person would [not] have a fear of persecution" in like circumstances. *Tang v. Lynch*, 840 F.3d 176, 181 (4th Cir. 2016) (quoting *Rusu v. INS*, 296 F.3d 316, 324 (4th Cir. 2002)). That is, even if it believed the underlying events did not constitute past persecution for an adult, the BIA never evaluated whether those acts would place a reasonable adult in fear of *future* persecution.

Thus, both the IJ and BIA failed to provide a meaningful analysis of whether Petitioner established a well-founded fear of future persecution. Having concluded that Petitioner did not establish past persecution, the agency decisionmakers simply stumbled through their determinations that he likewise did not have a fear of future persecution, with the IJ barely providing a coherent paragraph and the BIA resorting to Petitioner's age as a "changed circumstance" sufficient to deny relief.

While we owe some deference to the single-member BIA decision, that deference must be informed by a "thoroughness evident in the BIA's consideration" and "validity of its reasoning." *Martinez*, 740 F.3d at 910 (alterations and internal quotation marks omitted); *see also Orellana v. Barr*, 925 F.3d 145, 153 (4th Cir. 2019) (requiring a "cogent, articulable basis for [the BIA's] determination" before substantial evidence review can be conducted (internal quotation marks omitted)). Here, the agency simply did not provide a thorough and cogent basis for its decision. For these reasons, and because we have explained the errors committed with regard to the past persecution analysis (which informs

18

the future persecution analysis), we vacate the agency's decision on the persecution prong of the asylum analysis and remand for an analysis consistent with this opinion.

2.

Element #2: Nexus to Protected Social Group

As to nexus, the IJ acknowledged that "[m]embers of an immediate family may constitute a particular social group," A.R. 80; "gang members sought information from [Petitioner] about [Petitioner's] sibling," *id.*; and "each time the[] [gang members] beat him they asked him about his sister," *id.* at 77. Yet the IJ concluded that, without showing something "more," Petitioner had not demonstrated "that the gang intended to persecute him on account of his family." *Id.* at 80. The BIA likewise concluded that Petitioner did not establish "that his membership in the proffered particular social group comprised of his family members is one central reason for any past [sic] he suffered or future harm he fears." *Id.* at 3. Rather, it concluded the harm Petitioner fears "is motivated by an act of random criminal or gang violence, which is unrelated to a protected ground." *Id.*

The Government merely asserts that we "need not reach the agency's decision regarding nexus to a protected ground" because Petitioner failed to satisfy the government control prong of the asylum analysis. Resp't's Initial Resp. Br. 18 n.7; *see also* Resp't's Suppl. Resp. Br. 22 n.9.

Of note, the Government does not contend or even attempt to contend that the IJ and BIA were correct in finding that Petitioner failed to establish a nexus between his alleged persecution and particular social group membership. With good reason. This court has plainly held that "an individual's membership in h[is] nuclear family is a particular

19

social group." *Velasquez v. Sessions*, 866 F.3d 188, 194 (4th Cir. 2017); *see also Hernandez-Avalos*, 784 F.3d at 949 ("[M]embership in a nuclear family qualifies as a protected ground for asylum purposes."). Therefore, there is no support whatsoever for the IJ or BIA's conclusion that Petitioner has not sufficiently alleged a cognizable protected social group. As for nexus, Petitioner is required to demonstrate that the alleged persecution he experienced was "on account of" his membership in his nuclear family, which means his membership in his family had to be "at least one central reason for" the persecution. *Hernandez-Avalos*, 784 F.3d at 949 (internal quotation marks omitted).

Reviewing this claim under a substantial evidence standard, a reasonable adjudicator "would be compelled to conclude" that Petitioner's membership in his nuclear family was at least one central reason for the alleged persecution committed on behalf of the gang. *Hernandez-Avalos*, 784 F.3d at 948 (concluding that the targeting of a mother of a gang-recruited son was a valid nexus, without considering whether gang recruitment of the son was a valid nexus). In short, Petitioner's family ties were "more than 'an incidental, tangential, superficial, or subordinate reason' for his persecution." *Id.* at 949 (quoting *Crespin-Valladares*, 632 F.3d at 127).

The facts supporting the nexus requirement in this case are plentiful and compelling. The IJ recognized that each time gang members beat Petitioner, "they asked [Petitioner] about his sister." A.R. 77. When Petitioner did not give the gang member his sister's phone number, "he was threatened and beaten by the gang." *Id.* Moreover, testimony from Paola and Petitioner (which, again, the IJ credited) and declarations from their mother and

grandmother and four neighbors all state that Petitioner was beaten and threatened *because he was Paola's brother*.

But instead of recognizing the significance of this testimony, the IJ incomprehensively opined, "[T]he fact that gang members sought information from [Petitioner] about his sibling without more does not support [Petitioner's] claim that the gang intended to persecute him on account of his family." *Id.* at 80. The BIA likewise turned a blind eye to the evidence, stating, "It is well-established that generalized violence affecting the population at large is not a basis for asylum or withholding of removal." *Id.* at 4. But we have rejected the agency's "misguided" reasoning that "El Salvadoran gangs target various groups of people," explaining that courts should consider specific and "intertwined reasons" for the threats made in each case. *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 248 (4th Cir. 2017) (internal quotation marks omitted). In this case, Petitioner presented much more than claims of generalized violence. But the BIA, like the IJ, ignored this evidence, explaining that Petitioner merely "fears general violence in El Salvador," A.R. 4, even after noting Petitioner's testimony that he was abused "by gang members *because* the gang's leader wanted his sister to be his girlfriend," *id.* at 2 (emphasis supplied). Those who "seek refuge under our laws have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate." *Quintero v. Garland*, 998 F.3d 612, 2021 WL 2133916, at *24 (4th Cir. May 26, 2021) (internal quotation marks omitted).

As a result, we vacate the BIA's decision on the nexus analysis for lack of substantial evidence to support it.

21

### 3.

### Element #3: Government is Unwilling or Unable to Control

Finally, the IJ and BIA both concluded that Petitioner was unable to satisfy the third requirement for asylum -- that Petitioner's alleged persecution was perpetrated by an organization, MS-13, the El Salvadoran government was unable or unwilling to control -- because Petitioner "did not report any of the threats or the beatings that he received to the police." A.R. 80–81 (IJ Oral Decision); *see id.* at 4 (BIA: "[Petitioner] testified that he never reported any threats or mistreatment by the gang members to the police or to any other government official in El Salvador.").

### a.

### Exhaustion

The Government contends (ironically, for the first time on en banc review) and the dissent believes that we lack jurisdiction to review whether Petitioner satisfied the government control prong because he failed to exhaust the issue on appeal to the BIA.

If a petitioner "could have raised an argument before the B[IA], but didn't, we do not have the authority to consider the argument in the first instance." *Shaw v. Sessions*, 898 F.3d 448, 456 (4th Cir. 2018); *see* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right . . . ."). The exhaustion doctrine "serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *Lizama v. Holder*, 629 F.3d 440, 448 (4th Cir. 2011) (internal quotation marks omitted).

However, this court has concluded that if a petitioner raises an issue in his Notice of Appeal to the BIA, and the BIA goes on to "address" that issue, we possess jurisdiction to review it. *Lizama*, 629 F.3d at 448–49; *see also Cabrera v. Barr*, 930 F.3d 627, 631 (4th Cir. 2019). To meet this requirement, Petitioner need not "conjure up 'magic words'" so long as "h[is] arguments before the BIA in essence raised the concern." *Atemnkeng v. Barr*, 948 F.3d 231, 241 (4th Cir. 2020). The jurisdictional requirement is met here.

i.

For starters, the IJ analyzed the government control issue under the headings of "Past Persecution" and "Well-Founded Fear of Future Persecution." *See* A.R. 79–81. Correspondingly, in his Notice of Appeal to the BIA, Petitioner claimed that the IJ erred in "not finding that [Petitioner] has suffered past [persecution]" and "not finding a well-founded fear of persecution." *Id.* at 50. The Government cannot now fault Petitioner for not parsing his appellate claims in a manner the IJ did not see fit to do.[5] In addition, Petitioner stated in the Notice of Appeal that the IJ erred in denying withholding of removal and CAT relief because "a public official would acquiesce, consent or participate to [sic] [Petitioner's] death or torture." *Id*.

Petitioner also raised his concern about the IJ's government control conclusion in his brief to the BIA. He argued that "the apparent utilization of the local police to try to

---

[5] Despite the dissent's suggestion otherwise, our decision is not based solely on "how the IJ identified the issues." *Post* at 57–58. Rather, we find it relevant that Petitioner's Notice of Appeal challenged the IJ's decisions on past persecution and fear of future persecution, and the IJ in turn discussed the government control issue *under those headings* in its decision.

locate [Petitioner]," along with other factors, establish that he "suffered past persecution." A.R. 22. In reciting the facts presented to the IJ, Petitioner explained that "four people who were policemen working with gang members came to [his] mother's house threatening [his] mother so that [Petitioner] would turn himself into [sic] the gang members," and that his mother "saw El Pelon standing behind the police during that encounter" such that "she understood that El Pelon or the gang was linked to the police because they were asking about him." *Id.* at 18 (internal quotation marks omitted). In arguing his CAT claim, Petitioner contended the record demonstrated that Petitioner, Paola, Petitioner's mother, and Petitioner's grandmother "all believe that the police that inquired about [Petitioner] were working in tandem with the local MS-13 clique." *Id.* at 28.

ii.

In any event, another path to exhaustion applies here. A majority of circuits have found a claim exhausted "whenever the agency has elected to address in sufficient detail the merits of a particular issue," even if the agency raised it sua sponte, because "by addressing an issue on the merits, an agency is expressing its judgment as to what it considers to be a sufficiently developed issue." *Mazariegos-Paiz v. Holder*, 734 F.3d 57, 63 (1st Cir. 2013) (collecting cases).

Here, the BIA considered and decided the government control issue. It explicitly concluded, "[T]he [IJ's] finding that [Petitioner] has not demonstrated that the harm he fears in El Salvador was or would be inflicted by . . . individuals or groups that *the government is unable or unwilling to control*, is not clearly erroneous." A.R. 4 (emphasis supplied). The BIA then cited two decisions in support of its holding that an asylum

24

applicant must establish either that the government was the persecutor, or that the government was "unable or unwilling" to control the persecutors. *Id.* (citing *Mulyani v. Holder*, 771 F.3d 190, 198 (4th Cir. 2014); *Matter of A–B–*, 27 I&N Dec. 316, 337–38, 343–44 (A.G. 2018)). As factual support for its decision on the government control prong, the BIA also stated that Petitioner "testified that he never reported any threats or mistreatment by the gang members to the police or to any other government official in El Salvador." *Id.*

Despite this, the Government does not believe the BIA sufficiently ruled on the government control issue, asserting that the BIA merely "restated the [IJ's] holding." Resp't's Suppl. Resp. Br. 22 n.8. This is plainly incorrect. For one thing, the IJ did not cite to *Mulyani*, but the BIA did, demonstrating the BIA was not just rubber-stamping the IJ's analysis. *See* A.R. 4. In addition, the Government admits that "here, the [BIA] issue[d] an opinion adopting *and supplementing* the [IJ]'s reasoning." Resp't's Suppl. Resp. Br. 15 (emphasis supplied).

The dissent relies on our recent decision in *Tetteh v. Garland*, 995 F.3d 361, 2021 WL 1618471, at *2–3 (4th Cir. Apr. 27, 2021), for the proposition that the BIA did not address the issue Petitioner raises to this court. *See post* at 57 n.9. But *Tetteh* is inapposite. There, we entertained the argument that one of the petitioner's claims was exhausted because the BIA addressed it, and we resolved the argument by concluding that the BIA "did not [address the issue]" being raised on appeal. *Tetteh*, 2021 WL 1618471 at *3. However, here, the BIA explicitly decided the government control issue Petitioner appeals: "[T]he [IJ's] finding that [Petitioner] has not demonstrated that the harm he fears in El

25

Salvador was or would be inflicted by . . . individuals or groups that *the government is unable or unwilling to control*, is not clearly erroneous." A.R. 4 (emphasis supplied). Petitioner's "explanation for why he did not report his persecution" is an argument subsumed within the government control issue, not a standalone issue, as even the dissent appears to acknowledge. *See post* at 57 n.9 ("In fairness, *Tetteh* involved what we considered to be an 'issue.'").

Undeterred, the Government latches onto the BIA's statement that Petitioner "has not meaningfully challenged the [IJ]'s findings *in this regard* on appeal." Resp't's Suppl. Resp. Br. 22 n.8 (emphasis supplied); *see* A.R. 4. The Government (and presumably the dissent) read this sentence to mean that "the B[IA] found that [Petitioner] has not challenged the [IJ's] finding" on the government control issue, "abandoning any such challenge." Resp't's Suppl. Resp. Br. 22 n.8; *see post* at 57. This is an unreasonable reading of the BIA decision. The BIA clearly stated that Petitioner did not challenge the IJ's finding that "he never reported any threats or mistreatment by the gang members to the police or to any other government official in El Salvador." A.R. 4. And this is true. As explained below, Petitioner did not report the threats or mistreatment because he was afraid to do so or thought it would be futile. But the BIA *did not* say that Petitioner had abandoned any challenge whatsoever to the government control finding. Indeed, if the BIA were that clear, perhaps the Government would have raised this jurisdictional argument during the first round of briefing in this court.

iii.

Therefore, because Petitioner "raised [his] concern" with the IJ's persecution analysis regarding government control, and because (in all events) the BIA addressed this very claim, Petitioner sufficiently exhausted his governmental control challenge, and we possess jurisdiction to review it. *Atemnkeng*, 948 F.3d at 241.

The dissent places much emphasis on the fact that Petitioner failed to raise his "reasons" for not going to the police in his closing argument before the IJ. *Post* at 62–63; *see id.* at 62 ("[A]re we seriously going to conclude that an IJ abused its discretion by not sua sponte addressing a few lines of testimony that support an argument not even raised in closing?"). In a word, yes. We have long held (and very recently reiterated) that "[i]t is an abuse of discretion for the [BIA] or [IJ] to arbitrarily ignore relevant evidence." *Quintero*, 2021 WL 2133916, at \*24 (quoting *Rodriguez-Arias v. Whitaker*, 915 F.3d 968 (4th Cir. 2019)). Of note, the dissent cites no case where we have held the IJ is only required to address evidence mentioned in a closing argument, or that a petitioner must raise certain arguments or evidence in a closing argument in order for the IJ to be required to address them.

b.

Merits

To demonstrate that El Salvador's government was unable or unwilling to control the MS-13 gang members Petitioner fears, Petitioner offered testimony and documentary evidence to the IJ demonstrating that he did not report the threats and beatings to law enforcement because he was afraid to do so and believed the effort would be futile. Yet in

the face of this evidence, the agency rejected Petitioner's government control argument, in essence applying a per se rule that a petitioner is required to seek out the police or else sit on his asylum rights. This was legal error.

i.

Evidence Presented

Both Petitioner and Paola credibly testified why they believed that filing a police report would further increase Petitioner's risk of harm. Petitioner, Paola, their mother, and their grandmother all expressed the belief that the police visit to the mother's home occurred in coordination with El Pelón's gang, members of which were standing nearby watching the visit. Petitioner also provided country reports to supplement his sister's and his own credible testimony that reports to the local police are ineffective and can trigger retribution. *See* A.R. 147–48 (Petitioner explaining he "knew that the police did not have the capacity to protect [him]" because in a "similar" case, Petitioner's friend reported gang threats to the police and was later killed).

In addition, Petitioner supplemented the testimonial evidence about the dangers in El Salvador and the inability of the police to protect him with expert analysis explaining how MS-13 can "operate . . . largely without police or military interference because of corruption and the Salvadoran government's inability to maintain order," and how filing a police report can make matters worse because gang members will "seek to obtain the name of the person who reported [their activity] via their sources within the police, government and community and take revenge to send the message that others should not report similar crimes." A.R. 387.

## The Agency Decision

The IJ spent just a single brief paragraph on its determination that "the harm that [Petitioner] suffered did not occur at the hands of the El Salvadoran government or an agent that the government is unwilling or unable to control." A.R. 80. The IJ cited Petitioner's failure to report the threats or attacks to police and said simply that, although "[t]here is no doubt El Salvador has a high rate of crime," its government generally "has put measures into place to address criminal activity and has arrested gang members and corrupt police officers." *Id.* at 81. This is not enough. Purported Salvadoran efforts to combat gang violence and corruption in general do not excuse the agency's failure to support its decision with the proper legal and factual analysis of Petitioner's *specific* circumstances.

To support its determination that the IJ's finding on this issue was not clearly erroneous, the BIA explained, "Specifically, as noted by the [IJ], [Petitioner] testified that he never reported any threats or mistreatment by the gang members to the police or to any other government official in El Salvador." A.R. 4. The BIA's cursory analysis was erroneous for two reasons: (1) the agency essentially imposed a per se reporting requirement; and (2) it ignored vital evidence favorable to Petitioner.

### a)

### Reporting Requirement

"[A]n applicant who relinquishes a protective process without good reason will generally be unable to prove [his] government's unwillingness or inability to protect [him]." *Orellana*, 925 F.3d at 153. But we have rejected a per se reporting requirement,

explaining that an applicant can be excused from seeking government intervention if to do so "(1) would have been futile or (2) [would] have subjected [him] to further abuse." *Id.* (internal quotation marks omitted). Therefore, the application of such a per se requirement by the BIA was legal error, and legal errors "necessarily constitute an abuse of discretion." *Tassi v. Holder*, 660 F.3d 710, 725 (4th Cir. 2011).

On remand, we admonish the agency to meaningfully consider Petitioner's evidence as to why he did not report his abuse to the police. In so doing, we direct the agency to "engage in a child-sensitive evaluation of whether [Petitioner] was justified in not seeking police protection." Kids in Need of Defense, Amicus Br. Supp. Pet'r at 14. A child's "access to State protection . . . depends on the ability and willingness of the child's parents, other primary caregiver or guardian to exercise rights and obtain protection on behalf of the child." United Nations High Commissioner for Refugees, *Guidelines on Int'l Protection: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees United Nations High Comm'r for Refugees Guidelines*, at 16, https://www.unhcr.org/50ae46309.pdf (filed as ECF attachment). But "[i]t is important to remember that, due to their young age, children may not be able to approach law enforcement officials or articulate their fear or complaint in the same way as adults." *Id.* at 16–17; *see Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1071 (9th Cir. 2017) (en banc) (in an asylum case, explaining, "Even if [young applicants] do have th[e] cognitive ability [to understand their abuse], child victims may not only fear retaliation for reporting to authorities, but may also be practically unable to do so because their day-to-day actions are controlled by their abusers . . . ."); *see also id.* at 1074

30

(recognizing that "even the IJ understood the improbability of a younger [petitioner] reporting his abuse to the authorities").

b)

Ignoring Vital Testimony

Even if the BIA had utilized the correct legal standard -- which it did not -- Petitioner offered credible "unrebutted, legally significant evidence," *Tassi*, 660 F.3d at 719 (internal quotation marks omitted), that reporting the incidents to local police "would have been futile" or "subjected [him] to further abuse" or worse, *Orellana*, 925 F.3d at 153. Specifically, the evidence demonstrated that local law enforcement showed up with MS-13 gang members to Petitioner's mother's house looking for Petitioner, and in a similar situation, Petitioner's friend Omar filed a police report against the gang and "turned up dead" "inside of a well." A.R. 148. This evidence was "arbitrarily ignored" by the IJ and BIA, who never so much as mentioned any of the testimony on this point. *Tassi*, 660 F.3d at 719 (internal quotation marks omitted). "[A]n IJ is not entitled to ignore an asylum applicant's testimony" as to whether the government is unable or unwilling to control an applicant's persecutors. *Hernandez-Avalos*, 784 F.3d at 951 (internal quotation marks omitted). Because the IJ ignored relevant evidence, and because the BIA adopted the IJ's flawed conclusion, we are again constrained to vacate a portion of the agency's asylum decision.

We do not pass on whether the testimony and evidence presented by Petitioner is sufficient to satisfy the government control element of the asylum claim. However, we conclude that when disregarding "credible, significant, and unrebutted evidence," agency

31

adjudicators must offer "'specific, cogent reasons'" for doing so. *Orellana*, 925 F.3d at 152 (quoting *Tassi*, 660 F.3d at 722) (alterations omitted). Critically, Petitioner was "entitled to know that agency adjudicators reviewed all [his] evidence, understood it, and had a cogent, articulable basis for its determination that [his] evidence was insufficient." *Id.* at 153 (internal quotation marks omitted). Both the IJ and BIA abdicated their responsibility to address Petitioner's evidence that he could not safely or effectively report the violence to the police.

Remand -- not deference -- is the appropriate treatment when "the grounds upon which the administrative agency acted [are not] clearly disclosed and adequately sustained." *Cordova*, 759 F.3d at 338 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). Although our standard of review is deferential to an agency's considered determination, it does not authorize us to excuse misapplication of the law or to create a post hoc justification for an unexplained conclusion. We must require agencies to do their jobs so that we can do ours.

B.

Withholding of Removal

The determination that the IJ and BIA erred with regard to Petitioner's asylum claim necessarily implicates the agency conclusions as to his claim for withholding of removal. The IJ and BIA rejected Petitioner's withholding of removal claim, reasoning that his failure to establish a claim for asylum necessarily meant that he would be unable to meet the higher evidentiary standard for withholding of removal. *See Zelaya v. Holder*, 668 F.3d 159, 161 (4th Cir. 2012) (explaining, "[A]n [applicant] who cannot meet his burden of

proof on an asylum claim . . . necessarily cannot meet his burden of proof on a withholding of removal claim"). But because the BIA rested its conclusion as to withholding of removal on its flawed asylum determination, we vacate the BIA's withholding conclusion as well.

C.

CAT Relief

To qualify for relief pursuant to the CAT, an applicant must demonstrate "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Mulyani*, 771 F.3d at 200 (quoting 8 C.F.R. § 1208.16(c)(2)). An applicant is not required to link the likelihood of torture to a protected ground. *See Lizama*, 629 F.3d at 449. Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1); *see Mulyani*, 771 F.3d at 200. "The official or officials need not have actual knowledge of the torture; it is enough if they simply turn a blind eye to it." *Mulyani*, 771 F.3d at 200 (internal quotation marks omitted).

For all of the reasons set forth in our analysis of the asylum claim, the IJ's and BIA's CAT analyses likewise did not adequately address Petitioner's evidence regarding the police's consent and/or acquiescence, nor the "particularized risks of torture, country conditions, and mass human rights violations in the country of removal." Pet'r's Initial Br. 21–22. As with their asylum analyses, the IJ and BIA woefully underexplained their assessment of Petitioner's argument and evidence with regard to his CAT claim.

33

Therefore, we vacate the agency's decision on Petitioner's CAT claim and remand for further analysis.

IV.

For the foregoing reasons, we cannot turn a blind eye to the numerous errors made by the immigration courts below.  We grant the petition for review, vacate the immigration court decisions, and remand for proceedings consistent with this opinion.

*PETITION GRANTED;*
*VACATED AND REMANDED*

WYNN, Circuit Judge, concurring:

I fully concur in the majority opinion's thorough analysis of the various issues in this case. I write separately because I believe the unrebutted, substantial evidence in the record compels us to reverse the agency's determinations regarding past persecution and nexus, rather than merely vacate them and remand for reconsideration of those issues.

I.

Generally, when the Board of Immigration Appeals errs, "the proper course . . . is to remand to the agency for additional investigation or explanation." *Alvarez Lagos v. Barr*, 927 F.3d 236, 249 (4th Cir. 2019) (quoting *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam)). "But that is not an invariable rule." *Id.* If the record evidence, considered as a whole, "would compel 'any reasonable adjudicator' to reach the opposite conclusion, then a remand is unnecessary, and [this Court] will reverse the Board's finding." *Id.* (quoting *Cruz v. Sessions*, 853 F.3d 122, 130 (4th Cir. 2017)).

II.

Here, as the majority opinion holds, the immigration judge *and* the Board of Immigration Appeals erred by applying the wrong legal standards, arbitrarily disregarding relevant evidence, and failing to explain their decisions adequately. *See* Maj. Op. at 3, 12–13, 16–18, 20–21, 25–26, 27–33. And based on such errors, the majority vacates the agency's determination as to each prong of the asylum analysis—persecution, nexus to a protected ground, and government control—and remands for reconsideration. *See id.* at 3, 18, 21, 27–33. But when all relevant evidence in the record is properly considered under the correct legal standards, any reasonable adjudicator would be compelled to conclude

35

that Petitioner suffered past persecution as a child and that his membership in his nuclear family was at least one central reason for that persecution.

## A.

First, as to past persecution, reversal, not vacatur and remand, is the proper disposition because the undisputed facts in the record leave no doubt whatsoever that the harms Petitioner suffered as a child amounted to persecution.

To summarize the relevant evidence in the record: When Petitioner was 14-to-15 years old, he had five or six encounters with the notorious MS-13 gang. During each encounter, gang members armed with guns and knives approached him and demanded information regarding his sister Paola's whereabouts. When Petitioner refused to provide that information, gang members threatened to hurt or kill him and his family, and they also beat him up. Petitioner was threatened and beaten up by the gang three or four times, and his mother saw him arrive home with bruises and without a shirt or shoes. The last beating Petitioner suffered was so severe that he felt like he "almost die[d]." A.R. 143. This incident made Petitioner very "frightened," and he felt it was necessary to tell his mother about the gang's beatings and threats because "she saw the bruises and the [injuries] that [he] had." *Id.*

About two days after the last beating, Petitioner left his hometown out of fear for his safety and lived with an uncle on a farm located two hours away. During that time, he "didn't go anywhere" because he was afraid that the gang would find and hurt him. A.R. 144. Importantly, none of these facts have been rebutted, and the immigration judge found Petitioner *and* his sister credible.

This evidence would compel any reasonable adjudicator to conclude that Petitioner has established past persecution. Under this Court's precedent, "the threat of death alone constitutes persecution," *Tairou v. Whitaker*, 909 F.3d 702, 707–08 (4th Cir. 2018), and so too does being "severely physically abused," *Mulyani v. Holder*, 771 F.3d 190, 198 (4th Cir. 2014) (quoting *Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005)). I believe that precedent alone provides a sufficient basis for reversing the agency's determination.

But, lest there be any doubt, today we adopt a child-sensitive approach to asylum adjudication, holding that "[w]here a petitioner is a child at the time of the alleged persecution, the immigration court must take the child's age into account in analyzing past persecution and fear of future persecution." Maj. Op. at 15. Certainly, no reasonable adjudicator could conclude that a 14- or 15-year-old child who experienced all of the above harms—including a near-death beating at the hands of multiple armed gang members—did not suffer persecution.

In addition to inflicting these harms directly on Petitioner, MS-13 members threatened his sister Paola that the gang would kill Petitioner and their mother if Paola did not accept the MS-13 leader's advances. We have held that "[v]iolence or threats to one's close relatives is an important factor in deciding whether mistreatment sinks to the level of persecution." *Baharon v. Holder*, 588 F.3d 228, 232 (4th Cir. 2009). And as the majority opinion notes, consideration of such violence or threats is particularly important where the applicant was a child at the time of the relevant events. *See* Maj. Op. at 14–15; *see also Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042, 1045 (9th Cir. 2007) ("[A] child's reaction

to injuries to his family is different from an adult's. The child is part of the family, the wound to the family is personal, the trauma apt to be lasting.").

In sum, it is indisputable that Petitioner suffered harms amounting to persecution. Accordingly, I believe the Court should hold as a matter of law that Petitioner suffered past persecution and reverse, rather than vacate, the agency's determination to the contrary.

B.

As for nexus to a protected ground, a straightforward application of well-established Fourth Circuit precedent compels reversal of the agency's determination on this issue. Here, too, the record evidence makes clear that Petitioner has established a necessary element of his claim: that the persecution suffered by Petitioner occurred on account of his membership in his proposed particular social group, his nuclear family.

"To prove that persecution took place on account of family ties, [Petitioner] need not show that his family ties provide *the* central reason or even a dominant central reason for his persecution." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015) (internal quotation marks omitted) (quoting *Crespin-Valladares v. Holder*, 632 F.3d 117, 127 (4th Cir. 2011)). Rather, "he must demonstrate that these ties are more than 'an incidental, tangential, superficial, or subordinate reason' for his persecution." *Id.* (quoting *Crespin-Valladares*, 632 F.3d at 127). In other words, the crucial question is whether Petitioner's familial relationship with his sister Paola was at least one "central reason why [he], and not some other person, was . . . targeted" by the gang. *Alvarez Lagos*, 927 F.3d at 249.

38

Here, the record evidence would compel any reasonable adjudicator to answer that question in the affirmative. Indeed, the immigration judge's own "statement of facts" in her decision shows that the agency's lack-of-nexus determination must be reversed.

Describing Petitioner's credited testimony, the immigration judge stated: "[W]hen the gang did not see his sister, they asked [Petitioner] where she was, if she was coming back and for her phone number. [Petitioner] did not give them his sister's phone number and he was threatened and beaten by the gang." A.R. 77. The immigration judge also noted Petitioner's testimony that "each time [the gang] beat him[,] they asked him about his sister." *Id.* Furthermore, Petitioner testified that during one of those encounters, El Pelón himself—the local gang leader who was after Petitioner's sister—asked questions about her and threatened Petitioner.

As these facts unambiguously demonstrate, the gang repeatedly threatened and beat up Petitioner in an attempt to elicit information regarding his sister's whereabouts. And they specifically targeted Petitioner, and not some other person, *because he was Paola's brother*. Surely then, Petitioner's familial ties to his sister were "more than 'an incidental, tangential, superficial, or subordinate reason' for his persecution." *Hernandez-Avalos*, 784 F.3d at 949 (quoting *Crespin-Valladares*, 632 F.3d at 127). Notably, the Government does not attempt to defend the agency's nexus finding, instead arguing only that we need not reach this issue.

To be sure, the majority opinion appears to accept as much, holding that "a reasonable adjudicator 'would be compelled to conclude' that Petitioner's membership in his nuclear family was at least one central reason for the alleged persecution committed on

39

behalf of the gang." Maj. Op. at 20 (quoting *Hernandez-Avalos*, 784 F.3d at 948). Accordingly, consistent with what we have previously done in similar situations, *see, e.g.*, *Alvarez Lagos*, 977 F.3d at 249–52; *Cruz*, 853 F.3d at 130; *Hernandez-Avalos*, 784 F.3d at 950, the Court should hold as a matter of law that Petitioner has satisfied the nexus requirement and reverse the agency's determination on this issue.

## III.

The unrebutted, substantial evidence in the record compels us to reverse, rather than vacate, the immigration judge's and the Board of Immigration Appeals' determinations regarding past persecution and nexus. Reversal would also streamline the proceedings on remand by narrowing the issues to be adjudicated as well as by eliminating the possibility of the agency erring yet again as to either nexus or persecution, or both—which would lead to another appeal. So, reversal is not only the proper legal course; it is the efficient and just one too.

I conclude by adding that Petitioner has been seeking protection in the United States for more than five years. We should not prolong his quest any more than necessary.

QUATTLEBAUM, Circuit Judge, with whom Judges WILKINSON, NIEMEYER, AGEE, RICHARDSON, and RUSHING join, dissenting:

Even when confronted with seemingly sympathetic circumstances like those involving Hernan Portillo-Flores—indeed, especially when so confronted—as judges, we are constrained as to how we respond. We must always ask whether we can, as a matter of jurisdiction, act. And even if we can, we must ask, under the applicable standard of review, how we should act. Those process-oriented questions can feel unsatisfying, but even so, we should not, and in fact cannot, disregard them. These time-tested guardrails ensure that judges act only when constitutionally authorized and not on matters that fall within the purview of the Executive or Legislative branches.

With respect for my friends and colleagues in the majority, we have jumped over those guardrails today. Portillo did not exhaust the administrative remedies available to him before petitioning our Court for review. Accordingly, we do not even have jurisdiction to review the denial of his asylum and withholding claims. In other words, we are without authority to act on those claims. And even if we had jurisdiction, we need only find substantial evidence in the record to support the findings that Portillo was not entitled to relief. Although the record contains such evidence, the majority has cast our standard of review aside and effectively reweighed the evidence to reach issues not necessarily before us.

For those reasons and as set forth in more detail below, I would dismiss the petition for lack of jurisdiction or, alternatively, deny the petition for review.

41

## I.

Portillo, a native and citizen of El Salvador, entered the United States in October 2015 near Eagle Pass, Texas, as a 15-year-old unaccompanied juvenile. He soon encountered U.S. Customs and Border Protection agents and admitted to illegally entering the country by crossing the Rio Grande.

The Department of Homeland Security ("DHS") served Portillo with a Notice to Appear for removal proceedings, charging him under the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i), as a noncitizen present in the United States without having been admitted or paroled. He was released to live with family in the United States, and the DHS later initiated removal proceedings.

Portillo conceded removability but applied for asylum, withholding of removal and protection under the Convention Against Torture. He claimed that if he returned to El Salvador, he would be "harmed, tortured, or killed" by the gang MS-13 because of his membership in a particular social group—namely, "a member of [his] sister's family." A.R. 780. He also stated that Salvadorian police will not protect him because "they are working along with MS-13 in order to fulfill their threats to [his] family." A.R. 780.

### A.

Portillo and his sister, Paola, testified at the removal hearing. Paola said that the family's problems with MS-13 began in 2013 when she was living with Portillo and their mother in Ciudad Delgado, El Salvador. A local gang leader, known as "El Pelón," wanted her to be his girlfriend. Paola testified that when she resisted, El Pelón told her that if she

42

failed to submit to his demands, "he might kill [her] mother and/or [her] brother." A.R. 201. One day, as she left school, El Pelón confronted Paola and told her that if she continued to refuse him, "something's going to happen" to Portillo and their mother. A.R. 203. Paola testified that neither she nor her family went to the police about these threats. Instead, the family sent her to the United States.

Portillo was not told about these threats. But in the months after Paola's departure from El Salvador, members of MS-13 approached him five or six times with knives and a handgun, asking for information about her location. Once, a group of gang members told Portillo, who was then 14 years old, that if he failed to help them, he would "get hurt." A.R. 139. Portillo also testified that the gang beat him three or four times. Portillo said the last beating he received from MS-13 was the worst, claiming he almost died. Yet he provided no details about the extent of his injuries other than describing his injuries as "bruises" and "blows." A.R. 143. He also said he did not receive medical treatment.[1]

Neither Portillo nor his family reported these events to the police. Portillo said he did not because the police did not have the capacity to protect him. When asked why he thought that, he said that a friend "turned up dead somewhere" after reporting MS-13 extortion efforts to the police. A.R. 148. He also said, "I was afraid that the gangs would

---

[1] Rather than describing all the testimony, the majority seems to conclude that, as a matter of medical fact, Portillo was beaten "almost to the point of death." Maj. Op. at 3. Under the applicable standard of review, however, we are to identify the IJ's findings and then determine whether they are supported by substantial evidence. The IJ never found that Portillo was almost beaten to the death. Rather, the IJ found that Portillo was "beaten" and that his injuries did not require medical attention. A.R. 87. Both of those findings are supported by substantial evidence.

43

find—they would have learned that I had filed a report against them." A.R. 149. But when questioned further about this fear, he conceded the police "might have been able to protect" him, but he worried "that [his] mother was still there." A.R. 149.

After Portillo was last approached by MS-13, his mother sent him to live with his uncle on a ranch in Chalatenango, about two hours away from Ciudad Delgado.[2] While there, Portillo said he did not leave the ranch and had food brought to him because he feared MS-13 would find him.

During the time Portillo was away, his mother told him that four uniformed police officers came to the house looking for him, and that two gang members were watching the visit from a distance. Although Paola was in the United States at the time of this incident, she said their mother felt this interaction meant "El [Pelón] or the gang was linked to the police because they were asking about [Portillo]." A.R. 206. When pressed on how he knew the police were part of the gang, Portillo expressed uncertainty. He said "I don't know. They might be able to do something against the gang members. I don't really know." A.R. 175.[3]

---

[2] How much time elapsed between the last incident and his move to Chalatenango is far from certain. Portillo testified that he left Ciudad Delgado soon after his last encounter with MS-13. But he also said he was last approached by MS-13 in February 2015. And he said he moved to Chalatenango in August or September 2015. Based on that testimony, and relevant to his claim that he fled El Salvador as a result of the persecution from MS-13, there were seven to eight months that passed between his run-ins with MS-13 and the time he left.

[3] Portillo conceded that only his mother, who provided a statement but did not testify, witnessed the event first-hand. Despite Portillo's concession, the majority adopts Portillo's interpretation, concluding that "El Pelón showed up *with the police*." Maj Op. at (Continued)

Following the visit from the police, Portillo said his mother moved to an apartment in Ciudad Delgado. As far as he knows, the gang has not contacted her since.

Although Portillo had no interaction with the gang in Chalatenango, he left after about a month because he was afraid that the gang would find him. He claimed he could not simply hide in another region of El Salvador because MS-13 is "all over the country," and that, regardless of where he moved, they may still find him. A.R. 152. Portillo left El Salvador and entered the United States in October of 2015.

Portillo also submitted documents in support of his application for relief, including reports on country and gang conditions in El Salvador, as well as statements from family members and friends. However, Portillo conceded that his mother is the only other person with first-hand knowledge of his treatment by MS-13.

Then, Portillo's lawyer gave a closing argument. He addressed the issues of whether the harm Portillo experienced rose to the level of persecution, whether such persecution was on account of Portillo's family and whether circumstances in El Salvador had changed enough to make it less dangerous for Portillo. He also argued that Portillo's extensive criminal record once he entered the United States should not prevent him from receiving relief.[4] Importantly, however, Portillo's lawyer did not mention anything about Portillo not

---

3. In doing so, it quotes the testimony of Portillo, Paola and their grandmother about an event they did not witness. Maj. Op. at 5 and 24.

[4] Portillo received six possession of marijuana charges in 2018 and was also charged with drinking while driving and driving without a license. Portillo acknowledged his criminal history and the number of charges he received very shortly after turning 18 before (Continued)

going to the police because of what happened to his friend. He did not argue Portillo feared he would be persecuted if he reported his persecution or explain how the death of Portillo's friend fit into any part of his theory for relief.

B.

In her oral decision, the IJ found Portillo and his sister to be credible witnesses. Yet, she denied his application for asylum, withholding of removal and protection under the CAT.

Regarding the requirements for asylum, the IJ first found that, although Portillo was threatened and beaten by members of MS-13, his "injuries did not require any medical attention and based on that, . . . the level of harm that [Portillo] experienced does not rise to the level of persecution." A.R. 79.[5] And while Paola testified "that she received death threats directed towards her mother and her brother," the IJ declined to find "that the death threats that [Paola] received could be imputed" to Portillo. A.R. 80. However, the IJ noted that if the BIA determined that the threats could be imputed to Portillo, he may be able to

_____

the immigration judge. The IJ noted that Portillo had been arrested several times for drinking and driving, possession of marijuana and driving a stolen car.

[5] From this language, the majority concludes that "[i]t is crystal clear [that the IJ and the BIA] rejected [Portillo's] persecution argument solely because the injuries did not require medical attention." Maj. Op. at 13. While the majority's interpretation is not unreasonable, it is not "crystal clear." Another reasonable interpretation is that the IJ concluded the fact that Portillo did not require medical attention was simply evidence that his experience did not rise to the level of persecution. After all, the IJ never said that, in order to establish persecution, medical treatment is required.

46

establish past persecution "since death threats constitute harm rising to the level of persecution." A.R. 80 (citing *Hernandez-Avalos v. Lynch*, 784 F.3d 944 (4th Cir. 2015)).

The IJ also found that "the harm that [Portillo] suffered did not occur at the hands of the El Salvadoran government or an agent that the government is unwilling or unable to control." A.R. 80. She emphasized that Portillo did not report his treatment by MS-13 to the police. She then acknowledged the high crime rate in El Salvador, an issue Portillo's counsel raised in his closing, but noted that, based on reports submitted by the government, the country has taken steps to address gang activity and police corruption. The IJ did not address Portillo's testimony that he felt the police could not protect him because of what happened to his friend. As noted above, however, Portillo's counsel did not mention this evidence in his closing argument.

Echoing her past-persecution analysis, the IJ also ruled that Portillo did not otherwise establish a well-founded fear of future persecution. Accordingly, she concluded Portillo failed to establish his eligibility for asylum. And because Portillo failed to meet "the lower asylum standard," he "necessarily fail[ed] to satisfy the more stringent standard of withholding of removal." A.R. 81.[6]

---

[6] Additionally, while the IJ acknowledged that members of an immediate family may constitute a protected social group, she concluded that "the fact that gang members sought information from [Portillo] about his sibling without more does not support [his] claim that the gang intended to persecute him on account of his family." A.R. 80. Therefore, the IJ found that Portillo did not establish "a nexus between the harm suffered and a protected ground." A.R. 80. On review, the BIA found that the IJ was correct in finding that Portillo "did not meet his burden of establishing the requisite nexus between the alleged harm he fears and his membership in a particular social group." A.R. 10. Instead, it concluded that the record supported the IJ's finding that his fears are of "an act of random (Continued)

As to Portillo's CAT claim, the IJ considered the Human Rights reports and the news articles Portillo submitted describing that violence was a significant problem. But she held that Portillo did not "provide[] evidence that shows that it is more likely than not that he specifically would be tortured in the future in El Salvador with the consent or acquiescence of the government." A.R. 81. As a result, she denied his request for relief under the CAT.

C.

Portillo appealed the IJ's decision to the BIA. In his Notice of Appeal, he identified the following issues: (1) the IJ erred in denying his application for asylum; (2) the IJ erred in not finding that he suffered past persecution; (3) the IJ erred in not finding that he had established a nexus on account of a protected ground; (4) the IJ erred in not finding a well-founded fear of persecution on account of a protected ground; (5) the IJ erred by not addressing relocation and changed country conditions as Portillo contended that he had established past persecution on account of a protected ground; (6) the IJ erred in denying withholding and CAT relief in light of sufficient evidence to support those claims; and (7) referenced that additional arguments would be submitted in a brief. A.R. 50. Then in the brief in support of his appeal, Portillo identified four issues: (1) whether the IJ erred in finding no past persecution in light of her acknowledgment that Portillo had been

criminal or gang violence," and not motivated by a protected ground. A.R. 10. On appeal, Portillo contends the IJ and the BIA erred in concluding he failed to connect the alleged persecution to his status as a member of his sister's family. But the government does not dispute Portillo's contention that the IJ and BIA erred in finding an insufficient nexus between the alleged persecution and Portillo's membership in a protected group; thus, we need not address that issue.

threatened to death and beaten on occasions; (2) whether the IJ erred in holding Portillo to an adult standard of persecution; (3) whether the IJ erred in finding no nexus to a protected ground even though Portillo was targeted on account of his family ties to his sister; and (4) whether the IJ erred in denying protection under the CAT by saying the Salvadorian government as a whole must consent or acquiesce to his being tortured. A.R. 20.

Portillo did not include the IJ's decision on El Salvador being unwilling or unable to control MS-13 in either his Notice of Appeal or brief to the BIA. Nor did he mention the IJ's failure to address any fear Portillo had of reporting to the police due to the information he had about his friend's death. Likewise, these issues were not discussed in the body of the brief. Nowhere are those issues even mentioned.

D.

The BIA dismissed Portillo's appeal. First, it found "no clear factual or legal error" in the IJ's determination that Portillo did not establish past persecution or a well-founded fear of persecution on a protected ground. A.R. 9. Regarding past persecution, the BIA found that the IJ was not required to apply a child-specific standard of proof, and that she "correctly found that although [Portillo] was threatened and beaten on several occasions in El Salvador, he never suffered any serious physical harm requiring medical attention." A.R. 9. Next, it concluded that unlike prior Fourth Circuit cases such as *Tairou v. Whitaker*, 909 F.3d 702 (4th Cir. 2018), where a death threat was enough to constitute past persecution, Portillo did not *directly* receive a death threat. Instead, the BIA affirmed the IJ's conclusion, and found that "the alleged 'death threat' here was made to [Portillo's] sister— not to [Portillo]." A.R. 10.

49

Additionally, the BIA held that the IJ did not clearly err in concluding that Portillo failed to demonstrate that the harm he fears in El Salvador "was or would be inflicted by the government or by individuals or groups that the government is unable or unwilling to control." A.R. 11. Like the IJ, the BIA emphasized Portillo's failure to report any threats or mistreatment to the police or government officials in El Salvador. Then, consistent with Portillo's Notice of Appeal and citing his brief, the BIA noted that Portillo "has not meaningfully challenged the Immigration Judge's findings in this regard on appeal." A.R. 11. Accordingly, the BIA concluded that Portillo "is not a refugee for asylum purposes," and that "he has not satisfied the higher burden of proof for withholding of removal." A.R. 11.

Turning last to his CAT claim, the BIA held that Portillo did not sufficiently show "that it is more likely than not that he will be tortured 'by or at the instigation of or with the consent or acquiescence [to include willful blindness] of a public official or other person acting in an official capacity.'" A.R. 11. It acknowledged that Portillo's "grandmother and sister 'believe' that the Salvadoran police are working with local MS gang members," but found that Portillo "has not presented sufficient evidence" on this issue. A.R. 11. Accordingly, it concluded that the IJ did not clearly err in denying his CAT claim.

50

## II.

Portillo timely petitioned for review of the BIA's decision affirming the IJ's denial of his application for asylum, withholding of removal and relief under CAT, and ordering his removal from the United States to El Salvador.

On appeal, Portillo argues that, with respect to the asylum and withholding of removal claims, the IJ and BIA erred in finding that he did not carry his burden to prove past persecution, which includes his argument that this issue should be evaluated from the perspective of a child, or establish that the government of El Salvador is unwilling or unable to protect him from MS-13. He also argues that the IJ and BIA failed to conduct a meaningful CAT analysis.

## III.

Beginning with his arguments concerning asylum and withholding of removal, the Immigration and Nationality Act ("INA") authorizes the Attorney General to grant, at his discretion, asylum to applicants who qualify as refugees under 8 U.S.C. § 1101(a)(42)(A). *See* 8 U.S.C. § 1158(a)(1), (b)(1)(A); *Mejia v. Sessions*, 866 F.3d 573, 578 (4th Cir. 2017). To qualify as a refugee, an applicant bears the burden of proving that he "is unable or unwilling to return to" his country of origin "because of [past] persecution or a well-founded fear of [future] persecution on account of," as relevant here, his "membership in a particular social group." 8 U.S.C. §1101(a)(42)(A); *see also* 8 U.S.C. § 1158(b)(1)(B)(i); 8 C.F.R § 1208.13(b); *Orellana v. Barr*, 925 F.3d 145, 151 (4th Cir. 2019). In addition, "an applicant alleging past persecution must establish either that the government was

51

responsible for the persecution or that it was unable or unwilling to control the persecutors." *Mulyani v. Holder*, 771 F.3d 190, 198 (4th Cir. 2014). But, because asylum is a form of discretionary relief, "the Attorney General is *not required* to grant asylum to everyone who meets the definition of refugee." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.5 (1987) (emphasis in original).

The elements of a claim for withholding of removal are generally the same for an asylum claim. *See Camara v. Ashcroft*, 378 F.3d 361, 367 (4th Cir. 2004). However, in contrast to an asylum claim, "[i]f an applicant for withholding of removal establishes her claim, the Attorney General *cannot* remove her to her native country." *Mejia*, 866 F.3d at 578–79 (quoting *Anim v. Mukasey*, 535 F.3d 243, 252 (4th Cir. 2008)). Accordingly, "the standard of proof for withholding of removal is higher, requiring the applicant to establish a 'clear probability' of persecution, rather than the less stringent 'well-founded fear' of persecution that will suffice to make out an asylum claim." *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018). "Necessarily, an applicant who fails to meet the lower standard for showing eligibility for asylum will be unable to satisfy the higher standard for showing withholding of removal." *Mulyani*, 771 F.3d at 198 (internal quotation marks and citation omitted).

A.

Portillo argues that the IJ and BIA committed three errors in finding that the harm he suffered in El Salvador did not rise to the level of persecution. Portillo first claims that in conducting their past-persecution analyses, the IJ and BIA failed to consider the harmful

52

acts he and his sister suffered from the perspective of a child.[7] Second, he argues that even from an adult perspective, the physical abuse he suffered rose to the level of persecution. Third, he argues that MS-13 threatened to kill him, which, alone, constitutes persecution. I do not address these arguments, however, because even if Portillo were to prevail on them, under our standard of review, we must uphold the BIA's decision that he is not eligible for asylum or withholding of removal because we lack the jurisdiction to reconsider the IJ and the BIA's determinations that he did not establish that the Salvadorian government was unable or unwilling to control MS-13. In any event, those determinations are supported by sufficient evidence.[8]

Persecution "encompasses harm inflicted by either a government or an entity that the government cannot or will not control." *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011). The question is a factual one which must be resolved based on the record in each case. *Diaz de Gomez v. Wilkinson*, 987 F.3d 359, 365 (4th Cir. 2021). And the failure to prove the issue is dispositive of Portillo's claim for asylum and claim for

---

[7] I have no objection to the majority's conclusion that age may be considered as a factor in determining whether a petitioner has experienced persecution. But I disagree with placing such controlling emphasis on data submitted by amici that has not been through the evidentiary process. *See* Maj. Op. at 15–16.

[8] A claim for asylum or withholding of removal based on a well-founded fear of future persecution, like claims based on past persecution, require the applicant to show the government would be unable or unwilling to control the alleged persecution by a private actor. *See Orellana*, 925 F.3d at 151. Therefore, we likewise need not address the BIA's determinations that Portillo did not have a well-founded fear of future persecution.

withholding of removal, which is subject to a higher standard for showing eligibility. *See Mulyani*, 771 F.3d at 197–98.

B.

But before addressing the merits of this issue, I agree with the majority that we must first consider whether we have jurisdiction over this appeal. That determines whether we can act at all. Critical to the resolution of this question is whether Portillo exhausted his administrative remedies. Despite my disagreements with the majority on the issue of jurisdiction, I share its frustration that this issue was not raised to the panel. But our mutual frustration should not cause us to bend our jurisdictional rules. We either have jurisdiction or we do not, and here we do not.

In 8 U.S.C. § 1252(d)(1), "Congress wrote the exhaustion requirement into the jurisdictional grant to the Court for the review of removal orders." *Cabrera v. Barr*, 930 F.3d 627, 631 (4th Cir. 2019). Under that provision, "[a] court may review a final order of removal only if the alien has exhausted all administrative remedies available to the alien as of right . . . ." 8 U.S.C. § 1252(d)(1). We have previously interpreted this provision to be a jurisdictional bar. *Massis v. Mukasey*, 549 F.3d 631, 638 (4th Cir. 2008).

Here, Portillo did not exhaust his administrative remedies as to his asylum and withholding claims. More specifically, Portillo did not appeal to the BIA the IJ's decision that he failed to establish that the Salvadorian government was unable or unwilling to control MS-13 for purposes of his asylum and withholding claims. He listed seven issues in his Notice of Appeal to the BIA and four issues on appeal in his brief to the BIA. The government-control issue was not one of them. What's more, the specific issue about which

54

Portillo now complains—that the IJ and the BIA ignored the evidence Portillo introduced about his fear of reporting his persecution to the authorities because, when his friend did so, he ended up dead—is not mentioned at all. These issues are not only absent from the lists of issues on appeal contained in his Notice of Appeal and brief; they are not mentioned anywhere in the body of Portillo's brief to the BIA.

It is true that the requirement that a party exhaust his remedies and preserve issues for appeal does not require "magic words." *Atemnkeng v. Barr*, 948 F.3d 231, 241 (4th Cir. 2020). But it does require that the "arguments before the BIA in essence raised the concern." *Id.* "[A]dministrative exhaustion bars consideration of general issues that were not raised below." *Id.* at 240 (internal quotation marks and citation omitted). Here, Portillo did not raise a concern about the unwilling or unable to control argument generally or about the specific argument that he did not go to the police because he feared further persecution. Likewise, he did not argue that the IJ ignored evidence on these issues. "Under 8 U.S.C. § 1252(d)(1), [Portillo] may not raise an issue on appeal that he did not previously raise before the IJ and BIA." *Massis*, 549 F.3d at 639; *see also Shaw v. Sessions*, 898 F.3d 448, 456 (4th Cir. 2018) ("To fail to raise a legal theory before the Board is to abandon that theory."). Portillo simply did not exhaust his remedies as to the unwilling and unable issue on his asylum and withholding claims. Had the BIA simply said as much and dismissed the appeal of those claims, this would be an easy case.

But the BIA did not do that. Instead, it affirmed the IJ did not commit clear error in concluding that Portillo failed to demonstrate that the harm he fears in El Salvador "was or would be inflicted by the government or by individuals or groups that the government is

unable or unwilling to control." A.R. 11. And it mentioned Portillo's failure to report his persecution to the authorities.

Seizing on that language from the BIA, the majority concludes we have jurisdiction. In support of this conclusion, it relies on our *Lizama v. Holder* decision, where we held that we had jurisdiction even when a petitioner did not fully present an issue below when he mentioned the issue in his Notice of Appeal to the BIA and the BIA addressed the issue. 629 F.3d 440, 448–49 (4th Cir. 2011). But that is not what we have here. Portillo did not mention anything about the IJ ignoring the evidence he presented about his friend in his Notice of Appeal to the BIA or in his brief. For that matter, he does not even raise the government-control issue generally. *Lizama*, therefore, does not save Portillo from his failure to exhaust.

The majority's jurisdictional decision is not, however, limited to *Lizama*. It also broadens the scope of our jurisdiction by joining other circuits that have held a claim is exhausted "'whenever the agency has elected to address in sufficient detail the merits of a particular issue,' even if the agency raised it sua sponte, because 'by addressing an issue on the merits, an agency is expressing its judgment as to what it considers to be a sufficiently developed issue.'" Maj. Op. at 24 (quoting *Mazariegos-Paiz v. Holder*, 734 F.3d 57, 63 (1st Cir. 2013)). But even the broadened view of jurisdiction the majority adopts today does not rescue Portillo.

Importantly, the BIA did not address Portillo's argument that the IJ ignored evidence that he did not report the persecution to police because he feared, based on what happened to his friend, that doing so would subject him to additional persecution. Not only

56

did the BIA not address that issue "in sufficient detail" to indicate it was "expressing its judgment as to what it considers to be a sufficiently developed issue;" it did not address the issue at all. *See Mazariegos-Paiz*, 734 F.3d at 63. And the BIA's statement that Portillo "has not meaningfully challenged the Immigration Judge's findings in this regard on appeal," A.R. 11, conflicts with the conclusion that it considered the issue sufficiently developed to address sua sponte. That distinguishes this case from those the majority cites. Those cases involve issues actually addressed by the BIA. They do not find jurisdiction for issues not addressed by the BIA but related to issues the BIA addressed.[9]

Last, in determining that Portillo preserved this issue, the majority explains that "[t]he [g]overnment cannot now fault [Portillo] for not parsing his appellate claims in a manner the IJ did not see fit to do." Maj. Op. at 23. Respectfully, how the IJ identified the

---

[9] The closest case we seem to have on this issue is our recent decision in *Tetteh v. Garland*. There, we addressed the petitioner's argument that a pardoned offense is not a conviction under the Immigration and Nationality Act. *Tetteh v. Garland*, No. 19-2357, 2021 WL 1618471, at *2–3 (4th Cir. Apr. 27, 2021). The petitioner, however, never raised that issue to the IJ or the BIA. We recognized that even though some of our sister circuits have found exhaustion if the agency has addressed the merits of a particular issue in sufficient detail, those cases did not apply in Tetteh's case because the BIA had not addressed whether a pardoned offense was or was not a conviction under the INA. For that reason, we dismissed the portion of the petition related to Tetteh's argument about a pardoned offense not being a conviction for lack of jurisdiction because it was a new claim that was not the same issue the BIA addressed. *Id.* at *3. That is very similar to what we have here. In fairness, *Tetteh* involved what we considered to be an "issue." *Id.* at *2-3. Whether Portillo's explanation for why he did not report his persecution is a new issue or a new argument is a closer call. But either way, *Tetteh*'s reasoning should apply here. While the majority's characterization of this footnote discussion as reliance on *Tetteh* may be a bit over-stated, the decision is consistent with my view that even the broadened approach to jurisdiction the majority adopts today does not give us the ability to exercise jurisdiction over the arguments Portillo now advances.

57

issues is not the issue. The issue, as established by the cases the majority cites, is whether Portillo "in essence raised the concern." *Atemnkeng*, 948 F.3d at 241. And no matter how generously one reviews Portillo's appeal to the BIA, he did not.

C.

But even if the majority were correct that we have jurisdiction, Portillo's arguments fail on the merits. When, as here, an applicant purports to fear persecution by a private actor, such as MS-13, "[w]hether a government is 'unable or unwilling to control' a private actor 'is a factual question'" that we review for substantial evidence. *Orellana*, 925 F.3d at 151 (quoting *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011)).[10] Because this standard of review is so important to the outcome of this case, I address it in some detail before considering the merits of Portillo's claims.[11]

1.

We need only find substantial evidence in the record to support the findings that Portillo was not entitled to relief. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *T-Mobile South, LLC v. Roswell*, 135 S. Ct. 808, 815 (2015)). Generally, "[u]nder the substantial-evidence

---

[10] We review any legal questions de novo. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015).

[11] Like offensive linemen on a football team, standards of review lack glamour but are often decisively important. *Portillo-Flores v. Barr*, 973 F.3d 230, 235 (4th Cir.), reh'g en banc granted, 830 F. App'x 125 (4th Cir. 2020). Such is the case here.

standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citations omitted).

Substantial evidence is codified as the "highly deferential" standard of review for the BIA's factual findings in 8 U.S.C. § 1252(b)(4). *Nasrallah v. Barr*, 140 S.Ct. 1683, 1692 (2020); *see also Tang v. Lynch*, 840 F.3d 176, 180 (4th Cir. 2016). This statute limits our review to "the administrative record on which the order of removal is based," and instructs that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(A)–(B); *see also I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) ("To reverse the BIA finding we must find that the evidence not only *supports* [the opposite] conclusion, but *compels* it . . . ."). Stated differently, it requires us to "uphold [the BIA's] factual findings unless no rational factfinder could agree with the BIA's position." *Temu v. Holder*, 740 F.3d 887, 891 (4th Cir. 2014). Such a narrow standard of review "recognizes the respect we must accord both the BIA's expertise in immigration matters and its status as the Attorney General's designee in deportation decisions." *Huaman-Cornelio v. Bd. of Immigration Appeals*, 979 F.2d 995, 999 (4th Cir. 1992).

Ultimately, "[w]e may not disturb the BIA's determinations on asylum eligibility so long as those determinations 'are supported by reasonable, substantial, and probative

evidence on the record considered as a whole.'" *Mulyani*, 771 F.3d at 197 (quoting *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011)). And in conducting this review, "[w]e may not reweigh the evidence, and, [e]ven if the record plausibly could support two results: the one the IJ chose and the one [the petitioner] advances, reversal is only appropriate where the court find[s] that the evidence not only supports [the opposite] conclusion, but *compels* it." *Tang*, 840 F.3d at 180 (internal quotation marks and citations omitted).

2.

Guided by this standard of review, I turn to Portillo's challenge to the BIA's finding that he did not establish the Salvadorian government was unable or unwilling to control MS-13. The IJ's decision was based on two primary pieces of evidence. First, she found that Portillo did not report the threats or beatings to the police. This evidence is consistent with our precedent, which holds that "an applicant who relinquishes a protective process without good reason will generally be unable to prove [his] government's unwillingness or inability to protect [him]." *Orellana*, 925 F.3d at 153. That fact provides substantial evidence in support of the IJ's decision.

Second, the IJ explained that the State Department Country Reports on Human Rights in El Salvador indicate that "the government of El Salvador has put measures into place to address criminal activity and has arrested gang members and corrupt police officers." A.R. 81. Again, this evidence comports with our precedent. "Typically, we have approved of the [agency's] proclivity for finding State Department Country Reports to be the definitive word in asylum cases." *Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir.

60

2014). This only adds to the already sufficient substantial evidence supporting the IJ's decision.

Then, on review, the BIA determined that the IJ's conclusion was not clearly erroneous. In doing so, it emphasized that Portillo "testified that he never reported any threats or mistreatment by the gang members to the police or to any other government official in El Salvador." A.R. 11. It also noted that Portillo had not "meaningfully challenged" this conclusion of the IJ on appeal. A.R. 11.

Portillo, however, argues that his petition should be granted because the BIA ignored important evidence related to the reason Portillo did not report his persecution to the police. He says evidence in the record indicates that "doing so (1) 'would have been futile' or (2) 'have subjected [him] to further abuse.'" *Orellana*, 925 F.3d at 153 (quoting *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006)).

Taking those issues in reverse order, Portillo claims that he feared further abuse based on his testimony that his friend turned up dead after reporting gang extortion to the police. And he complains that neither the IJ nor the BIA considered this evidence. It is true that neither the IJ nor the BIA addressed this testimony specifically in written orders. But, despite that, for at least two reasons, his petition should still be denied.

First, in his closing argument to the IJ, Portillo never mentioned that he did not go to the police because he feared doing so would subject him to additional persecution. His counsel's arguments total five pages transcribed. A.R. 230–34. He makes several arguments and refers to evidence Portillo introduced in support of those arguments. Yet

61

nowhere does he mention the government-control issue or the evidence he now faults the IJ and BIA for not addressing.

In my view, the majority's conclusion that the IJ "arbitrarily ignored" Portillo's testimony places an unfair burden on the IJ. Maj. Op. *ante* at 31. Evidentiary hearings can involve a substantial amount of evidence. That was the case here. There were over 100 pages of testimony. Keep in mind that Portillo has the burden of proof on this issue of government control. If he thinks evidence helps meet that burden, it is incumbent on him not only to introduce it into the record but to point it out to the IJ in his argument. And if he does not, are we seriously going to conclude that an IJ abused its discretion by not sua sponte addressing a few lines of testimony that support an argument not even raised in closing? Surely, that cannot be our rule.[12]

Moving from the proceedings before the IJ to those before the BIA, Portillo did not raise the reasons he failed to report to the police in his either his Notice of Appeal or brief to the BIA. A.R. 16–29. If this issue, and the evidence about his friend, was important to Portillo's case and, if, as he now argues, he thought the IJ erred in not considering it, surely he would have raised the point specifically to the BIA so the BIA would be on alert about his concern. But as noted above, he did not mention it at all. Thus, even assuming the BIA's

---

[12] We would never hold a district court to this standard, nor should we. We certainly do not hold ourselves to it. For example, we frequently refuse to even consider issues the parties did not raise below or address in their briefs. *See Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020); *Carter v. Lee*, 283 F.3d 240, 252 (4th Cir. 2002). Ironically, we seem to require more out of the immigration judges that not only have enormous caseloads and work with limited resources, but also that, by law, *see ante*, at 9, are afforded significant discretion.

opinion gives us jurisdiction, Portillo's failure to raise the issue to the BIA is relevant to our review of the BIA's decision. Frankly, Portillo's criticism of the BIA for not more thoroughly addressing an argument that Portillo did not even make borders on frivolous. For that reason, we should reject it out of hand. Under this record, the BIA's failure to address this issue cannot possibly be an abuse of discretion. It is well-settled that the IJ and the BIA are not required to discuss every piece of evidence in the record. *Ai Hua Chen*, 742 F.3d at 179. That is especially true when the petitioner does not raise that issue or that evidence in his arguments.

Second, even considering the evidence to which Portillo points, if we faithfully apply our standard of review, we cannot disturb the BIA's findings based on this record. Under that standard, we must look to the record, viewed as a whole, to determine if it compels a different result. *See Elias-Zacarias*, 502 U.S. at 481 n.1. While the unverified testimony about Portillo's friend, taken in isolation, might support the assertion that going to the police would have subjected Portillo to more abuse, the record as a whole does not. For example, at his removal hearing, Portillo first asserted that he "knew that the police did not have the capacity to protect [him] from that gang" because he had a friend who was found dead after he reported MS-13 to the police. A.R. 147. But, during subsequent questioning, he walked back his original claim by stating, "[the police] might have been able to protect me, but the point is that my mother was still there." A.R. 149. Portillo also appeared to acknowledge that the police arrested a gang member in his friend's case. And when pressed on whether the police were part of the gang, Portillo said "I don't know. They might be able to do something against gang members. I don't really know." A.R. 175.

The same is true on the issue of futility. Portillo argues that he introduced evidence that he and his family "believed that the police were in cahoots with the MS-13 gang . . . ." Appellant's Op. Br. at 18. But the BIA acknowledged Portillo's claim that "his grandmother and sister 'believe' that the Salvadoran police are working with local MS gang members." A.R. 11. Even considering that claim, it concluded that Portillo did not provide sufficient corroborating evidence to conclude "that he will be tortured by or with the requisite acquiescence of any government official in El Salvador." A.R. 11.[13] By putting "believe" in quotes, a fair reading of the BIA decision is that it was making the point that belief is not the same as evidence. And it felt Portillo did not provide enough of the latter.

Was there evidence from which the IJ could have reached the opposite result? Sure. But our question is not whether there was any evidence that going to the police would be futile. Our question is whether the record, as a whole, compels a different result. Plainly, it does not. In fact, the record contains even more evidence supporting the BIA's decision than the BIA cited.

Could the IJ and the BIA have provided more detail and explained their conclusions more thoroughly? Without a doubt. But they pointed to "highly probative evidence" in the State Department Country Reports of the Salvadorian government's efforts to combat gang violence and in Portillo's failure to report the persecution. *Gonahasa v. I.N.S.*, 181 F.3d

---

[13] While this language was used in the BIA's CAT analysis, the analysis of that issue is so similar that, in my view, this reasoning applies here as well.

538, 542 (4th Cir. 1999). And they addressed Portillo's futility explanation, which was his only argument about why he did not report the persecution to the police. This indicates the IJ and the BIA "heard and thought" and did "not merely react[]" to the arguments and evidence before them. *Ai Hua Chen*, 742 F.3d at 179 (quoting *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010)). Under our precedent, this is enough. We uphold "even 'a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Garland v. Dai*, No. 19-1155, 2021 WL 2194837, at *7 (U.S. June 1, 2021) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

Under the standard of review we are compelled to follow, if there is more than a scintilla of evidence in the record to support this factual finding, we must uphold it "unless no rational factfinder could agree with the [BIA's] position." *Tang*, 840 F.3d at 180 (quoting *Temu*, 740 F.3d at 891). The BIA's decision that Portillo failed to establish the Salvadorian government was unwilling or unable to control MS-13 is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481 (citation omitted). Thus, a rational factfinder could certainly agree with the BIA. "The only question for judges reviewing the BIA's factual determinations is whether *any* reasonable adjudicator could have found as the agency did." *Garland*, 2021 WL 2194837, at *6. Therefore, the BIA's decision must stand, regardless of whether some or all of our Court might have reached a different decision.

3.

Last, I am concerned about the instructions given by the majority on remand. The

majority opinion provides as follows:

> On remand, we admonish the agency to meaningfully consider Petitioner's evidence as to why he did not report his abuse to the police. In so doing, we direct the agency to 'engage in a child-sensitive evaluation of whether [Petitioner] was justified in not seeking police protection.' Kids in Need of Defense, Amicus Br. Supp. Pet'r at 14. A child's 'access to State protection . . . depends on the ability and willingness of the child's parents, other primary caregiver or guardian to exercise rights and obtain protection on behalf of the child.' United Nations High Commissioner for Refugees, *Guidelines on Intern'l Protection: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees United Nations High Comm'r for Refugees Guidelines*, at 16, https://www.unhcr.org/50ae46309.pdf (filed as ECF attachment). But '[i]t is important to remember that, due to their young age, children may not be able to approach law enforcement officials or articulate their fear or complaint in the same way as adults.' *Id.* at 16–17; *see Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1071 (9th Cir. 2017) (en banc) (in an asylum case, explaining, 'Even if [young applicants] do have th[e] cognitive ability [to understand their abuse], child victims may not only fear retaliation for reporting to authorities, but may also be practically unable to do so because their day-to-day actions are controlled by their abusers . . . .'); *see also id.* at 1074 (recognizing that "even the IJ understood the improbability of a younger [petitioner] reporting his abuse to the authorities").

Maj. Op at 30–31. Frankly, I am not entirely clear on what those instructions entail. But it

seems to me that the majority is relying on articles submitted by amici and language from

a Ninth Circuit case to suggest that the failure to report persecution to the governmental

authorities may not be relevant in the case of a child. If so, I disagree. First, the parties

never argued that this issue should be impacted by Portillo's age. Second, to the extent that

is the implication of our decision today, that is not our law. Nor should it be. Unless a child

lives alone or otherwise lacks adult support, I see no reason to minimize a petitioner's

66

failure to report, which is well-settled in our Circuit. Third, the record makes clear Portillo had a number of adults—his mother, sister, uncle and grandmother—in his life. They were certainly available to assist him in reporting to the police. Thus, the reasons expressed in the language the majority quotes from the article and Ninth Circuit opinion do not seem applicable here.

IV.

Finally, I turn to Portillo's argument that the IJ and BIA erred by denying his application for CAT protection. In reviewing a denial of relief under CAT, "[t]he standard of review is the substantial-evidence standard: The agency's 'findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Nasrallah*, 140 S. Ct. at 1692 (quoting 8 U.S.C § 1252(b)(4)(B)).

An alien seeking CAT protection bears the burden to show that "it is more likely than not that he or she would be tortured" in the country of removal. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 971 (4th Cir. 2019) (quoting 8 C.F.R. § 1208.16(c)(2)). "Torture is defined as (1) 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person' in a manner that is (2) 'by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Id.* (quoting 8 C.F.R. § 1208.18(a)(1)).

Portillo raises three issues concerning his CAT claim. First, he contends that the IJ's "most obvious legal error" was requiring that Portillo show the Salvadorian government consented or acquiesced to his torture. Appellant's Op. Br. at 20. He claims

that the proper standard is whether "a public official or other person acting in an official capacity" will consent or acquiesce to the torture. *Id.* (internal quotation marks and citation omitted) (emphasis omitted). Second, Portillo challenges the brevity of the IJ and BIA's CAT analysis, claiming they neither address all of his arguments nor adequately explain the basis of their CAT decisions. Third, he asserts that the BIA committed legal error by "engaging in fact-finding in the first instance of whether a public official was likely to acquiesce to Mr. Portillo's torture." *Id.* at 21.

First, I disagree with Portillo's argument that the IJ committed a legal error, much less an obvious one, in finding that Portillo failed to establish that it was more likely than not that he would be tortured in El Salvador "with the consent or acquiescence of the government." A.R. 81. The language of the IJ's conclusion follows the established law of this Circuit. Namely, to qualify for protection under the CAT, a petitioner bears the burden to "show that, if removed, it is 'more likely than not that he or she would be tortured' with the consent or acquiescence of the government" in their country of origin. *Salgado-Sosa*, 882 F.3d at 456 (citing 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1)).

Moreover, the BIA, in affirming the IJ's denial of relief under the CAT, stated as follows:

> The record also supports the Immigration Judge's determination that the respondent has not met his burden of establishing his claim under the Convention Against Torture inasmuch as he has not shown that it is more likely than not that he will be tortured 'by or at the instigation of or with the consent or acquiescence [to include willful blindness] of a public official or other person acting in an official capacity' in El Salvador (IJ at 6). 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *see Matter of Z-Z-O-*, 26 I&N Dec. 586 (BIA 2015) (explaining that an Immigration Judge's predictive findings of what may or may not occur in the future are findings of fact, which are

68

reviewed under the 'clear error' standard); *see also Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011) (discussing Convention Against Torture standard).

A.R. 11. As Portillo acknowledges, this language sets forth the appropriate legal standard. Therefore, Portillo's argument that his CAT claim was denied based on an obvious legal error is without merit.

Next, Portillo argues that the IJ and BIA's CAT analyses were inadequate because they failed to address his fears that the police are complicit with MS-13's efforts to find him, or his "particularized risks of torture, country conditions, and mass human rights violations in the country of removal." Appellant's Op. Br. at 22. However, this argument ignores the first sentence of the IJ's CAT analysis, which states that she considered the country conditions described in the 2016 and 2017 State Department Country Reports on Human Rights in El Salvador. Further, in affirming the IJ's CAT findings, the BIA explicitly cited the pages of the IJ decision that referenced those reports. *See* A.R. 11. The BIA also held that "[a]lthough [Portillo] claims that his grandmother and sister 'believe' that the Salvadoran police are working with local MS gang members, [he] has not presented sufficient evidence demonstrating that he will be tortured by or with the requisite acquiescence of any government official in El Salvador." A.R. 11 (internal citations omitted).

Once again, our standard is whether there was evidence in the record to support the decision. Here, there was. Accordingly, the BIA's decision that the IJ did not err in finding that Portillo did not establish his eligibility for CAT protection is supported by substantial evidence and does not constitute "a wholesale failure [by] the IJ and BIA to consider

evidence" offered to support his CAT claim. *Rodriguez-Arias*, 915 F.3d at 974 (internal quotation marks and citation omitted).

And Portillo's argument that the IJ and the BIA failed to adequately explain how they arrived at their decisions fares no better. The IJ stated she considered the evidence of conditions in El Salvador, but that Portillo had not proven that it was more likely than not that he would be tortured with the consent or acquiescence of the Salvadorian government. Then, on review, the BIA cited to the applicable law, the relevant portions of the IJ decision and additional evidence in the record before concluding that the IJ did not err in finding that Portillo failed to offer sufficient evidence to support his claim. Although the BIA's decision could have been more comprehensive, the BIA announced its decision "in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted" to the evidence. *Ai Hua Chen*, 742 F.3d at 179 (quoting *Ayala*, 605 F.3d at 948). Therefore, reversal is not warranted.

Finally, the BIA did not "engag[e] in fact-finding in the first instance of whether a public official was likely to acquiesce to Mr. Portillo's torture . . . ." Appellant's Op. Br. at 21. Instead, it simply identified the proper legal standard and concluded that the IJ did not clearly err in relying on the same evidence that the IJ first identified in her decision. There is simply nothing in the record to support Portillo's argument.

## V.

For the foregoing reasons, I would dismiss Portillo's petition for review of the BIA's decision affirming the IJ's denial of his application for asylum and withholding of removal.

We do not have jurisdiction over those issues. Alternatively, I would deny the petition for review because substantial evidence in the record supports the BIA's decision that the Salvadorian government was unwilling or unable to control MS-13. Similarly, I would also deny the petition for review of the BIA's decision affirming the IJ's denial of his CAT claim because there is substantial evidence in the record that Portillo was not tortured by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.