**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GUILLERMO HERNANDEZ-ORTIZ;
FLORENTINO HERNANDEZ-ORTIZ,
                *Petitioners,*

        v.

ALBERTO R. GONZALES, Attorney
General,

              *Respondent.*

No. 04-71509

Agency Nos.
A76-346-033
A76-346-038

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 20, 2007—San Francisco, California

Filed August 8, 2007

Before: John T. Noonan, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Noonan

## COUNSEL

Todd Pickles, San Francisco, California, for the petitioners.

Blair O'Connor, United States Department of Justice, Washington, D.C., for the respondent.

## OPINION

NOONAN, Circuit Judge:

Guillermo Hernandez-Ortiz (Guillermo) and his younger brother, Florentino Hernandez-Ortiz (Florentino), petition for review of a decision of the Board of Immigration Appeals (the Board) affirming without opinion a decision of an Immigration Judge (the IJ) denying their requests for asylum and withholding of removal. As the Board's affirmance was summary, we review the decision of the IJ. *Acosta v. Gonzales*, 439 F.3d 550, 552 (9th Cir. 2006). Holding that the IJ erred as a matter of law, we grant the petition and remand.

### FACTS AND PROCEEDINGS

Guillermo and Florentino are natives of Guatemala and are of Mayan descent. They entered the United States from Mexico without documentation in 1991. Florentino applied for asylum on December 5, 1997, Guillermo on February 18, 1998. In 2000, the IJ consolidated their petitions. Evidentiary hearings followed on July 12, 2000, on November 30, 2001, and on September 12, 2002. The brothers submitted numerous documents on country conditions in Guatemala, including the report from the commission established by the Oslo Accord of June 23, 1994 (*Comision para el Esclarecimiento Historico* or CEH). These background documents were accepted into evidence. The brothers testified to the following events:

In 1982, the two brothers, then aged nine and seven respectively, lived in Gracias a Dios, a village of about 500 families in the northern part of the department of Huehuetenango, Guatemala. The village was inhabited almost exclusively by Mayan Indians. The brothers' parents were Tomas Hernandez-Perez and Tiburcia Ortiz Enriquez and their older brother, who was in his twenties, was named Humberto. The family lived on corn and beans that they planted and raised on land they owned about 40 minutes walking time distant from the village. In 1982, their lives were disrupted by the arrival of the Guatemalan army in Gracias a Dios.

"[A] lot" of soldiers came into the village. They carried weapons. They permitted no one to leave the village even to tend to their crops outside the village. The boys' parents were afraid of the soldiers and would not let the boys go outdoors. Humberto, the older brother, was called by the soldiers to serve in a civil patrol hunting guerillas; he fled, and the soldiers told the brothers' father that he would be killed if he didn't find Humberto. The soldiers came in the night and beat the boys' father in front of their mother and took him away. He returned and the family fled to the mountains. A week later they crossed the border to Mexico and took shelter in a refugee camp in Chiapas called La Gloria. While they were there, they learned from a Mexican official that the Guatemalan army had killed Humberto. Each brother feared to return to Guatemala lest he be regarded as a sympathizer with the guerillas and killed by the army.

The brothers' testimony was supplemented by that of Jaime Ross, a psychotherapist practicing in Mountain View, California, who submitted an evaluation of the brothers after he had interviewed them for three hours in 1999. His report is part of the record. Dr. Ross found that the brothers had "rather intense" symptoms of trauma from being driven out of their home country and losing their brother. Florentino appeared to him to be more deeply affected than Guillermo; both were "very traumatized."

At the hearing of September 12, 2002, Florentino corrected his earlier testimony in which he'd said he'd never left the United States. He now testified that he had once gone to Mexico to visit his parents at La Gloria; he returned to this country giving an alias; he was not permitted to enter; he tried again and succeeded in walking across the border. He concealed his trip from Guillermo because Guillermo had told him not to leave. Florentino's own misstatements to the IJ when first questioned had been, he said, to continue this deception of his brother.

At the conclusion of this session, the IJ gave her final decision orally, denying the brothers' requests for relief. Appeals to the Board and then to us followed.

## ANALYSIS

**[1]** *Legal Error.* In 2004, Joel Flaum, then Chief Judge of the Seventh Circuit, summed up the law:

> [A]ge can be a critical factor in the adjudication of asylum claims and may bear heavily on the question of whether an applicant was persecuted or whether she holds a well-founded fear of future persecution. The *Guidelines for Children's Asylum Claims* advises that "harm a child fears or has suffered . . . may be relatively less than that of an adult and still qualify as persecution." *See Guidelines for Children's Asylum Claims, INS Policy and Procedural Memorandum from Jack Weiss, Acting Director, Office of International Affairs to Asylum Officers, Immigration Officers, and Headquarters Coordinators (Asylum and Refugees)* 14, (Dec. 10, 1998), *available at* 1998 WL 34032561. Indeed, other courts have used age as a determinative factor in deciding whether an applicant is eligible for asylum. *See, e.g., Abay v. Ashcroft*, 368 F.3d 634, 640 (6th Cir. 2004) (overturning, on the basis of age, the

immigration judge's finding that a nine-year-old applicant had not adequately expressed a fear of future persecution).

*Liu v. Ashcroft*, 380 F.3d 307, 314 (7th Cir. 2004).

In 2006, a per curiam opinion of the Second Circuit addressed the asylum petition of a native of Guatemala of Mayan stock who, at the age of seven, had lived in a village invaded by the Guatemalan army. *Jorge-Tzoc v. Gonzales*, 435 F.3d 146, 147-48. His sister, his brother-in-law, and his brother-in-law's mother were shot. *Id.* The child did not see the killings but heard of them. *See id.* The court took into account the report of the CEH, written "to clarify with objectivity . . . the human rights violations and acts of violence connected with the armed confrontation." *Id.* at 149 (citation omitted). The report stated that the violence of the army was aimed at a particular social group, the Mayans. *Id.* The court quoted from the report:

> [S]tate forces and related paramilitary groups were responsible for 93% of the violations documented by the CEH, including 92% of the arbitrary executions and 91% of forced disappearances . . . [T]hroughout the armed confrontation the Army designed and implemented a strategy to provoke terror in the population [which] became the core element of the Army's operations, including those of a strictly military nature as well [as] those of psychological nature and those that were called "development" operations.

> . . . Jorge-Tzoc was a child at the time of the massacres and thus necessarily dependent on both his family and his community . . . Further, while the family remained in their village, Jorge-Tzoc's mother was afraid to go out of their home to obtain needed groceries . . . Jorge-Tzoc's father lost his land and his

animals as a result of [their eventual] move. This combination of circumstances could well constitute persecution to a small child totally dependent on his family and community.

*Id.* at 150.

**[2]** Against the background of ethnic cleansing, the court quoted with approval the summary of the law made by Judge Flaum in *Liu* and concluded that it was legal error for the IJ not to have considered the events in the village and the harm suffered by Jorge-Tzoc's family "from the perspective of a small child." *Id.* The IJ's finding that Jorge-Tzoc did not establish past persecution was vacated and the case remanded. *Id.* at 151.

**[3]** Three sister circuits have now vindicated a principle that is surely a matter of common sense: a child's reaction to injuries to his family is different from an adult's. The child is part of the family, the wound to the family is personal, the trauma apt to be lasting. We have already quoted with approval the INS *Guidelines for Children's Asylum Claims* referenced above. *Zhang v. Gonzales*, 408 F.3d 1239, 1247 (9th Cir. 2005). We now join the Second, Sixth, and Seventh Circuits in affirming the legal rule that injuries to a family must be considered in an asylum case where the events that form the basis of the past persecution claim were perceived when the petitioner was a child.

**[4]** The rule we articulate for this circuit is new but the principle is old. The three circuit cases reflect this common sense proposition. The IJ did acknowledge the ages at which Guillermo and Florentino experienced the injuries to which they testified. The IJ, however, did not look at the events from their perspective, nor measure the degree of their injuries by their impact on children of their ages. She committed legal error.

**[5]** *Credibility*. The IJ focused her attention on misrepresentations made by Florentino in connection with his search for his parents in Chiapas. The relevance of this trip and the misrepresentations is hard to see. The IJ herself raised the question whether Florentino's misstatements were material. They were not. *See Singh v. Ashcroft*, 367 F.3d 1139, 1143 (9th Cir. 2004) ("minor inconsistencies or factual omissions that do not go to the heart of the asylum claim are insufficient to support [an adverse credibility finding]").

Florentino's shaky dating of his trip and his communications with his parents furnished the IJ with a reason to question Guillermo's dating of a telephone call to their parents in which he learned the whereabouts of "Comandante Hernandez." The IJ supposed that because Florentino failed to find his parents at La Gloria during his 1997 trip, the 1998 phone conversation between the brothers and their parents was an "impossibility." However, it is not clear that the parents were not in La Gloria in 1998, only that Florentino could not find them in 1997.

**[6]** The IJ's credibility findings, we are compelled to conclude, are not supported by substantial evidence. *See Chebchoub v. INS*, 257 F.3d 1038, 1042 (9th Cir. 2001).

*The IJ's Alternative Analysis and Findings*. Aware of the fragility of her findings on credibility, the IJ offered what she styled "Alternative Analysis and Findings of Law." In this analysis she accepted the brothers' testimony as to the events in their village in 1982, but asked whether they had a fear of persecution if returned. "The first question" she addressed was whether they had suffered past harm rising to the level of the past persecution. The IJ found this question "very, very difficult." As in her credibility determination, the IJ did not take into consideration the age of the brothers in 1982. The legal error infected her conclusion that the brothers failed to meet their burden of proof as to whether they were subjected to past persecution.

**[7]** For the reasons stated, the petition is GRANTED. The IJ's decision is VACATED and the case REMANDED for further consideration of the petitioners' claims for asylum and withholding of removal.

**GRANTED VACATED AND REMANDED.**