UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



| | |
|---|---|
| CATALINA NEDELICA; ERICA SELARU; IONUT SELARU; FLORIN SELARU; ANDREEA SELARU, | No. 23-1269 Agency Nos. A208-926-118 A208-926-083 |
| Petitioners, | A208-926-117 A208-926-081 |
| v. | A208-926-082 |
| PAMELA BONDI, Attorney General, | ORDER |
| Respondent. | |

Before: GILMAN,[*] N.R. SMITH, and MENDOZA, Circuit Judges.

Respondent's motion to clarify or amend (Dkt. No. 34) is GRANTED in part. The memorandum filed March 21, 2025, is hereby amended. The amended memorandum will be filed concurrently with this order.

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the Court of Appeals, 6th Circuit, sitting by designation.

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

FILED

MAY 13 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS



| | |
|---|---|
| CATALINA NEDELICA; ERICA SELARU; IONUT SELARU; FLORIN SELARU; ANDREEA SELARU, <br><br> Petitioners, <br><br> v. <br><br> PAMELA BONDI, Attorney General, <br><br> Respondent. | No. 23-1269 <br><br> Agency Nos. <br> A208-926-118 <br> A208-926-083 <br> A208-926-117 <br> A208-926-081 <br> A208-926-082 <br><br> AMENDED MEMORANDUM[*] |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted May 14, 2024
Pasadena, California

Before: GILMAN,[**] N.R. SMITH, and MENDOZA, Circuit Judges.
Dissent by Judge N.R. SMITH.

Petitioners are a Romani family from Romania: Florin Selaru and Catalina

Nedelica are a married couple, and Erica, Ionut, and Andreea Selaru are their

children. They petition for review of a decision by the Board of Immigration

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.
[**]     The Honorable Ronald Lee Gilman, United States Circuit Judge for the Court of Appeals, 6th Circuit, sitting by designation.

Appeals ("BIA") denying their applications for asylum and withholding of removal.[1] The BIA affirmed the decision of an immigration judge ("IJ," and together with the BIA, the "Agency"), who found that Mr. Selaru and Ms. Nedelica did not establish that they had suffered past persecution and that they otherwise failed to establish a reasonable fear of future persecution based on their membership in a disfavored group, *i.e.*, the Roma ethnic group. We review the Agency's legal determinations de novo and its factual findings for substantial evidence. *Singh v. Holder*, 656 F.3d 1047, 1051 (9th Cir. 2011). We have jurisdiction under 8 U.S.C. § 1252(a). We GRANT the petition with respect to Mr. Selaru, DENY the petition as to Ms. Nedelica, and REMAND for further proceedings.[2]

1.      The Agency committed legal error in failing to consider the totality of the alleged past persecution to which Mr. Selaru was subjected. "[W]hen determining whether a petitioner's past mistreatment rises to the level of persecution, the BIA must apply cumulative-effect review." *Salguero Sosa v. Garland*, 55 F.4th 1213, 1218 (9th Cir. 2022). "Cumulative-effect review is essential" if a single incident may not amount to persecution, "but the cumulative

---

[1] The BIA also denied Petitioners' claim for relief under the Convention Against Torture ("CAT"), but Petitioners do not petition for review of the denial of CAT relief.

[2] Ms. Nedelica and Erica, Ionut, and Andreea Selaru are derivative applicants on Mr. Selaru's application for asylum.

effect of several incidents" might. *Id.* (internal quotation marks and citation omitted). "Where the BIA does not consider all the evidence before it, either by 'misstating the record [or] failing to mention highly probative or potentially dispositive evidence,' its decision is legal error and 'cannot stand.'" *Flores Molina v. Garland*, 37 F.4th 626, 632 (9th Cir. 2022) (alteration in original) (citation omitted). Such evidence may include "injuries to a family[, which] must be considered in an asylum case where the events that form the basis of the past persecution claim were perceived when the petitioner was a child." *Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042, 1046 (9th Cir. 2007).

Here, the Agency failed to consider a key incident underlying Mr. Selaru's claim for asylum that occurred when he was 11 years old. Mr. Selaru was walking with his mother in the park when a group of men approached and asked his mother if she was a Gypsy. She said "yes," and the men beat her while Mr. Selaru watched "in indescribable shock." The beating left his mother "in a critical condition." Mr. Selaru and his mother "had to take a cab to go urgently to the hospital[,]" though "[n]one of the 20 cabs that were stationed wanted to take [them] to the hospital because [they] are gypsies."

Neither the IJ nor the BIA addressed the fact that Mr. Selaru saw his mother beaten, much less into critical condition. Instead, the Agency characterized the incident as mere "difficulty obtaining medical care for his mother in Romania,"

without considering that the reason his mother needed medical care was that a group of men beat her into critical condition for being a "Gypsy," the focal point of the event. Nor did the Agency confront the fact that the 11-year-old Selaru witnessed the horrific incident and was left in indescribable shock. Under our precedent, such "injuries to a family *must* be considered," *Hernandez-Ortiz*, 496 F.3d at 1046 (emphasis added), and the Agency erred in failing to do so.[3] *See Rusak v. Holder*, 734 F.3d 894, 897 (9th Cir. 2013) (holding that "no testimony by [the petitioner] or other evidence directly linking the abuses suffered by her parents to her own psychological state" was required "to establish that an eleven or twelve year old girl would be traumatized when her father is beaten and killed and her mother arrested and raped by the police"); *Flores Molina*, 37 F.4th at 632. On remand, the Agency must consider Mr. Selaru's experience (as an 11-year-old child) witnessing the beating of his mother as part of its cumulative analysis. *See Hernandez-Ortiz*, 496 F.3d at 1046; *Salguero Sosa*, 55 F.4th at 1218. And the

---

[3] The dissent asserts that we seek to substitute our view of the incident with Mr. Selaru's mother. Dissent at 8. Not so. Although the IJ included a catchall phrase indicating that he had considered all of the evidence, the Agency's sterilized version of the event makes it impossible to know whether that was in fact true. *Flores Molina*, 37 F.4th at 639 n.7 ("The BIA's gesture to 'the totality of the record,' without mentioning or discussing [specific evidence], does not insulate the BIA from reversal. '[W]here there is any indication that the BIA did not consider all of the evidence before it, a catchall phrase does not suffice, and the decision cannot stand.'" (quoting *Cole v. Holder*, 659 F.3d 762, 771–72 (9th Cir. 2011) (alteration in original))).

Agency should consider the fact that Mr. Selaru was only 15 years old when he was arrested and beaten by the police with a rubber stick.[4] *See Singh v. Garland*, 57 F.4th 643, 654 (9th Cir. 2022) (quoting *Hernandez-Ortiz*, 496 F.3d at 1045) (noting that "[a]ge can be a critical factor in the adjudication of asylum claims," and holding that "[t]he conclusion that Singh experienced serious harm is strengthened by the fact that these attacks occurred when he was between the ages of 16 and 18.").

    2.    The Agency also erred in its analysis of whether Mr. Selaru had established an objectively reasonable fear of future persecution based on his membership in a disfavored group. A member of a disfavored group may establish a reasonable fear of future persecution without showing past harm that rises to the level of persecution. *Hoxha v. Ashcroft*, 319 F.3d 1179, 1183–84 (9th Cir. 2003). "While membership in a disfavored group is not by itself sufficient to demonstrate eligibility for asylum, 'the more serious and widespread the threat to the group in general, the less individualized the threat of persecution needs to be.'" *Salim v. Lynch*, 831 F.3d 1133, 1140 (9th Cir. 2016) (quoting *Sael v. Ashcroft*, 386 F.3d

---

[4] The dissent accuses the majority of making arguments that Mr. Selaru did not make. Dissent at 5–6. But "[w]e do not think we have exceeded the bounds of our discretion" merely because we have identified a case that Petitioners missed. *See Does v. Wasden*, 982 F.3d 784, 793 (9th Cir. 2020). Indeed, Mr. Selaru argues that such incidents cumulatively rise to the level of persecution, and his briefing indicates that age is an important consideration, and one that the Agency failed to engage with.

922, 925 (9th Cir. 2004) (internal citation omitted)).

The Agency erred in determining that the Roma are not a disfavored group in Romania. Its decision was based almost entirely on "attempts" by the European Union, of which Romania is a member, "to address issues experienced by Roma individuals." But absent evidence that Romania has joined the EU's attempts, and that such attempts have been effective in combatting what the Agency referred to as continued "discrimination and harassment" against the Roma, the European Union's efforts to curb persecution of the Roma have no bearing on whether the Roma are a disfavored group in Romania. And as set forth in our opinion in *Lapadat v. Bondi*, No. 23-1745, 2025 WL 467491 (9th Cir. Feb. 12, 2025), the Roma are a disfavored group.

Because the Agency erred in holding that the Roma are not a disfavored group, we remand so that the Agency may reassess whether, in light of the severity of the Roma's disfavored status in Romania, *see Lapadat*, 2025 WL 467491 at *12, Mr. Selaru has demonstrated a sufficiently high individualized threat of persecution. *See Sael*, 386 F.3d at 927 ("Because the record establishes that ethnic Chinese are significantly disfavored in Indonesia, Sael must demonstrate a 'comparatively low' level of individualized risk in order to prove that she has a well-founded fear of future persecution.").

3. With respect to Ms. Nedelica, we deny the petition for review.

Ms. Nedelica concedes that she did not suffer past persecution. And although the Roma are a disfavored group, she fails to demonstrate even a "'comparatively low' level of individualized risk" based on "evidence of past threats and violence" or other maltreatment. *See id.*

The petition is **GRANTED** in part and **DENIED** in part, and we **REMAND** to the BIA for further proceedings. Because the petition includes derivative petitioners, the case is remanded as to all the petitioners.

*Nedelica v. Bondi*, No. 23-1269

Smith, N. Randy, Circuit Judge, dissenting.[1]

In this case, Florin Selaru has not shown that the record compels a finding that his past experiences in Romania amount to past persecution or that he has a well-founded fear of future persecution. Therefore, I must respectfully dissent from the memorandum disposition. Why?

**A.**     My colleagues fail to address the standard of review in evaluating the lack of evidence in this record. Instead, they mistakenly argue that the Board of Immigration Appeals (BIA) committed legal error in failing to consider the totality of the circumstances when assessing whether Selaru established past persecution. To make this argument, they ignore the standard of review and remand this case based on two incidents that occurred when Selaru was 11 and 15 years old, which incidents my colleagues presume were not considered by either the immigration judge (IJ) or the BIA. There is no basis for this conclusion given any review of the record. Let me reference the whole of the record to confirm this statement:

---

[1] I agree with my colleagues that Petitioners did not challenge the denial of relief under the Convention Against Torture. I also concur in part 3 of their disposition that Catalina Nedelica did not establish past persecution or a well-founded fear of future persecution. Because Nedelica's claims and their children's claims were based on the same facts, Petitioners' children also did not establish past persecution or a well-founded fear of future persecution. Accordingly, I only refer to Selaru's claims in my dissent.

**1.** Before the IJ, Selaru's counsel did not present witnesses, resting instead on Petitioners' declarations pursuant to *Grava v. INS*, 205 F.3d 1177, 1180 (9th Cir. 2000) (holding that an applicant for asylum and withholding of removal "need not testify on his or her own behalf, except to swear to the truth of the application, and may rest on the application alone, subject to [the Government's] examination at the hearing"). When the government cross-examined Selaru regarding his declaration, it only referenced the 2000, 2010, and 2012 incidents. After the government's examination, Selaru's counsel questioned Selaru for the record, but only questioned Selaru about these same three incidents and Selaru's fear of future persecution, not mentioning or focusing on prior incidents. After Selaru had testified, the IJ expressly stated that she considered all the evidence in the record, "whether or not specifically mentioned." The IJ outlined incidents that occurred to Selaru in the 1990's: Selaru suffered from a lack of access to higher education, harassment in school, and difficulty obtaining medical care for his mother in Romania. The IJ added that Petitioners left Romania in 2004 for two years and lived in Italy, but returned to Romania because "there were no decent living conditions for them in Italy." The IJ then outlined the three incidents Selaru identified in his testimony (both on cross examination and on redirect) as the reasons he was afraid to return to Romania. First, in 2000, Selaru and a cousin

2

were arrested and beaten with a rubber stick by police because they were suspected of stealing from a neighbor. Selaru testified he was not injured. Second, in 2010, Selaru was stopped by the police while he was driving a car with his friend and taken to a police station for interrogation, where he was punched, slapped, and had his hair pulled, but he did not sustain any substantial injuries. Finally, in 2012, Selaru was cited for making a public disturbance at a restaurant. After listing and discussing all incidents in the record (from 1990 to 2012), the IJ concluded that none of the incidents (even considered cumulatively) rose to the level of persecution.

The BIA, citing to the IJ's decision and Selaru's declaration, agreed with the IJ that Selaru did not establish past persecution because "much of the past harm he experienced was . . . discrimination not rising to the level of persecution." The BIA affirmed that the 2000 and 2010 incidents with the police were "isolated incidents because there was insufficient evidence" that the two incidents (ten years apart) were related. The BIA also specifically considered the cumulative effect of the harm, concluding that Selaru's evidence failed to meet the standard for persecution.

**2.** Before the IJ, the BIA, and our court, Selaru does not argue (as my colleagues do) that the agency erred by failing to consider Selaru's status as a child

when any of the incidents occurred. Before the IJ, Selaru only testified regarding the 2000, 2010, and 2012 incidents. In his testimony, Selaru made no reference to his age at the time of the incidents as the basis for his claims.

3. Although Selaru included the 1990 incidents (including the incident with his mother) in his declaration, Selaru did not testify before the IJ about the significance of those incidents with regard to his claim of past persecution.

4. On appeal to the BIA, Selaru outlined his age during each incident but did not argue that the IJ failed to take into account his status as a child. Notably, when challenging the 2000 incident to the BIA, Selaru instead argued:

> [W]ith respect to the violent police abuse incident on April 11, 2000, [Selaru] states in his declaration, that he and a friend were stopped by the Romanian police who demanded they show their identification cards. When [Selaru] failed to produce his identification, he and his friend were taken in a police car and to section #6 in Craiova. There, they were beaten with a Rubber baton called "pulan" on unrelated false charges that they supposedly stole from their neighbors' houses. After the beating, [Selaru] and his friend were forced to clean the floors of the police station, and were abused/denigrated/ laughed at when doing so; all which was a particularly fearful and humiliating experience. After the fear evoking and subjugating ordeal, [Selaru] and his friend were threateningly warned by the police to be careful "*because they have their eyes on us*." (Declaration of [Selaru],Exh 2B pages 1-2). In testimony, [Selaru] stated emphatically "They beat us up...They hit us – they punched us. They – made us clean the floors and they made fun of us." (Transcript, Page 76, lines 10 and 14).

The record is clear: Selaru did not claim that the IJ failed to view this incident through

4

the lens of a fifteen-year-old child.

Similarly, although Selaru references his age with regard to the incident with his mother and his bullying at school, he never argued to the BIA that the IJ's error was based on the IJ's failure to assess the persecution based on a heightened standard from the perspective of a child. Lastly, and most important, Selaru does not cite any law or case to the BIA that would support such an argument.

5.     Finally, before us, Selaru cited to the incidents that occurred when he was a child and argued that the BIA "understated [his] experience of past mistreatments without the requisite analysis." However, Selaru does not argue that analysis was required beyond that of a "cumulative analysis." I emphasize, Selaru does not cite to *Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042 (9th Cir. 2007); *Rusak v. Holder*, 734 F.3d 894 (9th Cir. 2013); or *Singh v. Garland*, 57 F.4th 643 (9th Cir. 2022), to support his argument that the BIA failed to apply what he terms as the "requisite analysis." Instead, Selaru argued that "[t]he BIA failed to conduct a cumulative assessment that included all of the mistreatments in the context of the systematic hatred, highly ingrained prejudice of anti-gypsyism harbored by the average Romanian expressed with racial taunts and anti-Roma abuse, as well as the often-expressed malicious hostility and brutality of the Romanian police."

Despite never raising this "child perspective" issue (upon which my

5

colleagues would now remand), my colleagues grasp onto Selaru's references to age during the two incidents and make the arguments that Selaru did not make to conclude the agency erred.[2] We depart from our job as judges by making arguments that Selaru did not make. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (explaining that we will not "manufacture arguments for a party on appeal"); *see also Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929–30 (9th Cir. 2003) ("It is no accident that the Federal Rules of Appellate Procedure require the opening brief to contain the 'appellant's contentions and the reasons for them, *with citations to the authorities* and parts of the record on which the appellant relies.'" (emphasis added) (quoting Fed. R. App. P. 28(a)(9)(A))). Because Selaru has never argued that the agency erred in not assessing the harm from the perspective of a child, we should not do so and then seize on that argument to conclude that the record compels a conclusion that the agency erred.

**B.**     Although all Selaru's claims of harm are relevant to his past persecution

---

[2] My colleagues assert that they were within "the bounds of their discretion" in making these arguments. Maj. Dec. at 5 n.4. However, this was not a case of inartful briefing. Selaru never made the argument (here or before the agency) that the IJ should have considered his claims based on his perceptions as a child. Instead, my colleagues raise an issue not properly before us. *See United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) (explaining that courts "do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties" (citation omitted)).

claim, my colleagues take issue with the analysis of the IJ and the BIA, because they argue that "the Agency failed to consider a key incident underlying Mr. Selaru's claim for asylum that occurred when he was 11 years old." Maj. Dec. at 3. However, my colleagues are asking that the agency undertake an analysis our law does not require. Pursuant to *Hernandez-Ortiz*, the IJ is only required to consider "injuries to a family. . . in an asylum case where the events that form the basis of the past persecution claim were perceived when the petitioner was a child." 496 F.3d at 1046. Here, the IJ and the BIA acknowledged the incident in their decisions, demonstrating that they considered the harm to Selaru's mother.

The record is clear that Selaru was born in 1985 and the record demonstrates that the IJ knew the dates when the alleged events occurred. We do not require the IJ "to discuss every piece of evidence; it requires only that the IJ consider all evidence." *Almaghzar v. Gonzales*, 457 F.3d 915, 922 (9th Cir. 2006).

As noted above, the IJ outlined all three incidents that occurred to Selaru in the 1990's, which included the incident with his mother. Selaru outlined in his declaration the incident as follows:

> I still remember how on December, 29 1996, I went with my mom in the park. After a few minutes, a group of guys stopped in front of us and asked to my mom if she was a gypsy. My mom answered yes and then once they heard the answer they started to beat her. Even if we asked for help, no one reacted. I was in indescribable

7

shock. At some point they stopped beating her and left. Because my mother was in a critical condition, we had to take a cab to go urgently to the hospital. None of the 20 cabs that were stationed wanted to take us to the hospital because we are gypsies.

That the IJ summarized this incident as Selaru having "problems with getting medical assistance for his mother" does not indicate that the IJ failed to consider it. Although my colleagues may not agree with the agency's characterization of the incident, it is inaccurate to suggest that it was not considered. Bottom line: my colleagues just want to substitute their view of this incident for that of the IJ. Although this incident is clearly offensive, Selaru's narrative leaves out crucial information about the severity of the incident. For example, Selaru does not say how his mother was beaten, how long she was beaten, what injuries she received, or whether she obtained medical care. Thus, the IJ's assessment of the incident does not demonstrate that the IJ did not consider the incident. Moreover, there is no precedent requiring an IJ to explicitly mention every detail of every incident alleged. *See Najmabadi v. Holder*, 597 F.3d 983, 990 (9th Cir. 2010).

With regard to the 2000 incident, again we must presume that the IJ and the BIA were aware of Selaru's age during this incident and took that fact into account. Nevertheless, the IJ concluded that this occurrence was an isolated arrest, because Selaru was accused of stealing from neighbors and the incident was

8

unrelated to Selaru's 2010 harassment by the police. Although Selaru was 15 at the time of the arrest, Selaru testified that he did not sustain any injuries. Even taking into account Selaru's age, the incident was relatively minor. *See Hernandez-Ortiz*, 496 F.3d at 1046 (outlining that the IJ should "measure the degree of [petitioners'] injuries by their impact on children of their ages").

As to cumulative harm, Selaru stated his age when these incidents occurred in his brief to the BIA. Thus, even if the IJ were unaware of Selaru's age when she assessed Selaru's cumulative harm, we must presume that the BIA was aware of Selaru's age but nevertheless did not believe that it altered the IJ's past persecution analysis. Admittedly, neither the IJ nor the BIA specifically referenced Selaru's age. Nevertheless, there is no precedent requiring (and my colleagues cite to none) that require that the agency specifically acknowledge a petitioner's age at the time of any alleged incident. This is especially true, where, as here, Selaru entered the United States and applied for asylum when he was 31 years of age. *See Guidelines for Children's Asylum Claims*, INS Policy and Procedural Memorandum from Jack Weiss, Acting Director, Office of International Affairs to Asylum Officers, Immigration Officers, and Headquarters Coordinators (Asylum and Refugees) 14, (Dec. 10, 1998), *available at* 1998 WL 34032561 (outlining guidelines for child asylum seekers).

9

Lastly, even considering all of the alleged incidents, the record does not compel the conclusion that they cumulatively rise to the level of past persecution. Comparably, in *Hernandez-Ortiz*, when the petitioners were 9 and 7, their father was beaten by the Guatemalan army and their brother was killed. *See* 496 F.3d at 1044. In *Singh*, when the petitioner was between 16 and 18, he fled his home after he was the victim of a verbal confrontation and two physical attacks, one of which involved a death threat. 57 F.4th at 654. Additionally, the petitioner's brother also experienced physical violence and was forced to flee. *Id.* And in *Rusak*, when the petitioner was 11 or 12, the petitioner's parents suffered numerous abuses, including her mother's arrests and rape and her father's beating and subsequent death. 734 F.3d at 897. Thus, although we do not condone any suffering by Selaru, the harm in these cited cases is far worse than the harm suffered by Selaru. Although Selaru's experience of seeing his mother beaten was no doubt traumatic, this incident individually or cumulatively is not comparable to the harm suffered in these three cases cited by my colleagues.

**C.**   Finally, I do not agree with my colleagues that the IJ and the BIA improperly assessed the disfavored group analysis. However, our disagreement as to this issue is not relevant, because both the IJ and the BIA doubled down on their decisions as to a lack of fear of future persecution by also assessing Selaru's

objective fear after assuming a disfavored group (for which my colleagues would now remand for the same analysis). Substantial evidence supports these conclusions as to Selaru's objective fear of future persecution. As explained above, the totality of the harm suffered by Selaru arose from two isolated incidents with the police over the course of ten years, coupled with an incident in 2012 in a restaurant wherein he was cited by the police but not harmed. Selaru did not present any further evidence of an individualized risk. *See Sael v. Ashcroft*, 386 F.3d 922, 925 (9th Cir. 2004). That record does not compel a contrary conclusion as to future persecution. Moreover, the IJ recognized that Petitioners have family members still remaining in Romania, and there was no evidence that they "have been physically harmed based on any race or ethnicity."[3]

---

[3] Selaru's arguments that he and his family will be singled out based on their time in the United States lacks any foundation in this record.